25-5014

_____

# UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

## JACOB GLENN BLANKENSHIP, AS AN INDIVIDUAL,

**Plaintiff-Appellant,**

v.

## LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, ELLIOTT YOUNG, IN HIS INDIVIDUAL CAPACITY AND ACTING AS A TROOPER/OFFICER FOR KENTUCKY STATE POLICE,

**Defendants-Appellees.**

_____

On appeal from the United States District Court
For the Western District of Kentucky
Case No. 3:23-cv-00235

_____

## BRIEF OF APPELLANT JACOB BLANKENSHIP

_____

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ............................................ix

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE ............................................................3

SUMMARY OF THE ARGUMENT ....................................................15

ARGUMENT..............................................................................19

I. STANDARD OF REVIEW .........................................................19

II. FIRST AMENDMENT STANDARD ..............................................19

III. THE DISTRICT COURT ERRED BY FAILING TO FIND THAT THE ARREST AREA WAS A TRADITIONAL PUBLIC FORUM ...........................21

A. The Arrest Area Was A Traditional Public Forum ..........................21

1. Metro's Permit Was Not Exclusive ..........................................23

2. The Arrest Area Was Not Ticketed ..........................................28

IV. METRO AND YOUNG VIOLATED BLANKENSHIP'S FIRST AMENDMENT RIGHTS ........................................................30

A. Metro's And Young's Enforcement Of The Policy Does Not Survive Constitutional Scrutiny ........................................................30

1. The Exclusion Of Blankenship From The Permitted Area Was Not Content Neutral..............................................................................32

2. Metro Does Not Have A Compelling Interest In The Exclusion Policy Or Removing Blankenship From The Area ..........................................35

3. The Restriction On Blankenship's Speech Did Not Serve A Significant Government Interest .................................................................36

4. The Restriction On Blankenship's Speech Was Not Narrowly Tailored............39

5. The Restriction On Blankenship's Speech Did Not Leave Open Ample Alternative Channels Of Communication ..............................................................42

6. Metro's Code And Policy Grant Unbridled Discretion......................................44

7. The Restriction On Blankenship's Speech Was Not Reasonable Or Viewpoint Neutral..............................................................................................47

B. Metro Is Liable Under *Monell* For The Constitutional Violations.....................48

V. METRO AND YOUNG VIOLATED BLANKENSHIP'S DUE PROCESS RIGHTS ..................................................................................53

VI. YOUNG IS NOT ENTITLED TO QUALIFIED IMMUNITY .......................54

CONCLUSION ...................................................................................56

CERTIFICATE OF COMPLIANCE.....................................................57

CERTIFICATE OF SERVICE.............................................................58

ADDENDUM .....................................................................................59

# TABLE OF AUTHORITIES

## CASES

*American Jewish Congress v. City of Beverly Hills*, 90 F.3d 379 (9th Cir. 1996) (*en banc*)..................................................................................................................45

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .........................................19

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ...........................52

*Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545 (6th Cir. 2007) ..................................................................................................................53

*Bays v. City of Fairborn*, 668 F.3d 814 (6th Cir. 2012).........................................26

*Bethel v. Shoop*, 2024 U.S. App. LEXIS 13191 (6th Cir., May 30, 2024) .............54

*Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228 (6th Cir. 2015)....................34

*Blasecki v. City of Durham, N.C.*, 456 F.2d 87 (4th Cir. 1972) .............................31

*Boos v. Barry*, 485 U.S. 312 (1988) ................................................................22, 33

*Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807 (6th Cir. 2007) .......................................................................................................19

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010) .......................................................................................................26

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ...................................................39, 43

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ...............45

*Cohen v. California*, 403 U.S. 15 (1971)...............................................................36

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1925) ..............................................53

*Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788 (1985) ............. ..................................................................................................20, 21, 26, 47

iv

*Davenport v. City of Alexandria*, 710 F.2d 148 (4th Cir. 1983)..............................31

*Durham v. Brock*, 498 F. Supp. 213 (M.D. Tenn. 1980).........................................32

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) ......................................................19

*Forsyth County, Ga. v. The Nationalist Movement*, 505 U.S. 123 (1992)........33, 44

*Frisby v. Schultz*, 487 U.S. 474 (1988).................................................................22

*Gathright v. City of Portland*, 439 F.3d 573 (9th Cir. 2006)..................................26

*Gaudrya Vaishrava Soc'y v. City and County of San Francisco*, 952 F. 2d 1059 (9th Cir. 1991) .........................................................................................................30

*Gay and Lesbian Students Ass'n v. Gohn*, 850 F.2d 361 (8th Cir. 1988) .........20, 33

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................................53

*Hague v. C.I.O.*, 307 U.S. 496 (1939) ..................................................................22

*Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224 (6th Cir. 2003) .............19

*Hartman v. Thompson*, 931 F.3d 471 (6th Cir. 2019)................................28-29, 34

*Heffron v. Int'l Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) .....44

*Hickory Fire Fighters Ass'n v. City of Hickory, N.C.*, 656 F.2d 917 (4th Cir. 1981) ...................................................................................................................................31

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ...............30

*Johnson v. Minneapolis Park & Rec. Bd.*, 729 F.3d 1094 (8th Cir. 2013) .............25

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396 (6th Cir. 2019) .................................................................................................................54

*Kirkeby v. Furness*, 92 F.3d 655 (8th Cir. 1996) ...................................................36

*Kolender v. Lawson*, 461 U.S. 566 (1974)............................................................45

*Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U.S. 384, (1993) ..................................................................................................................................47

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................20, 33, 39-40, 42-43

*McCurry v. Tesch*, 738 F.2d 271 (8th Cir. 1984)....................................................43

*McGlone v. Cheek*, 534 Fed. Appx. 293 (6th Cir. Aug 02, 2013) .........................53

*McGlone v. Metro. Gov't of Nashville and Davidson Co., Tenn.*, No. 17-6291 (Sep. 19, 2018) (6th Cir. 2018) ........................................................................23, 24, 49

*McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076 (N.D. Fla. 2016) ......................................................................................................................27, 41, 50

*Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ..2, 17, 48, ..................................................................................................................................52

*Nat'l Federation of the Blind of Mo. v. Cross*, 184 F.3d 973 (8th Cir. 1999).........26

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971)............................30

*Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005)...15, 23, 24, 25, 26, 34, 49

*Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004)............................................23, 24, 49

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)..............31

*Pleasant Grove City v. Summum*, 129 S.Ct. 1125 (2009) ......................................26

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .........................................20, 33, 47

*Reform America v. City of Detroit, Michigan*, 37 F.4th 1138 (6th Cir. 2022)........35

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ....21, 47

*Saia v. People of State of New York*, 334 U.S. 558 (1948) ............................. 44-45

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011)...................................21, 38

*Schneider v. State of New Jersey*, 308 U.S. 147 (1939).........................................43

*Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996) ..........................24, 25

*Spingola v. Vill. of Granville*, 39 Fed. Appx. 978 (6th Cir. 2002) ........................21

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008)..............................26

*Stucker v. Louisville Metro Gov't*, 2024 U.S. App. LEXIS 11731 (6th Cir. May 13, 2024) ................................................................................................................48

*Teesdale v. City of Chicago*, 690 F.3d 829 (7th Cir. 2012)....................................26

*Terminiello v. Chicago*, 337 U.S. 1 (1949) ...........................................................36

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................36

*Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503 (1969) .................37

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) .................................31, 38

*United States v. Congress of Industrial Organizations*, 335 U.S. 106 (1948)........32

*United States v. Grace*, 461 U.S. 171 (1983)............................................22, 25, 32

*United States Postal Service v. Council of Greenberg Civic Ass'n*, 453 U.S. 114 (1981) ..............................................................................................................25

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................................................................................................................53

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......................................32, 39

*Williams v. Kentucky*, 24 F.3d 1526 (6th Cir. 1994).............................................54

*World Wide Street Preachers' Fellowship v. Reed*, 430 F. Supp. 2d 411 (M.D. Pa. 2006) ................................................................................................................43

## STATUTES

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1343(a)(3) ...............................................................1

28 U.S.C. § 1343(a)(4) ...............................................................1

42 U.S.C. § 1983 .......................................................................1

Louisville-Jefferson County Metro Government, Kentucky Code of Ordinances §
100.01 .......................................................................................3

Louisville-Jefferson County Metro Government, Kentucky Code of Ordinances §
100.02 .......................................................................................3

## RULES

Fed. R. Civ. P. 30(b)(6) ...............................................4, 9, 10-11, 45

Fed. R. App. P. 4(a)(1)(A) ..........................................................1

Fed. R. App. P. 32(a)(5) .............................................................57

Fed. R. App. P. 32(a)(6) .............................................................57

Fed. R. App. P. 32(a)(7)(B) ........................................................57

Fed. R. App. P. 32(f) ..................................................................57

6 Cir. R. 32(b)(1) ......................................................................57

## CONSTITUTION

First Amendment ............2, 10, 18, 19, 20, 21, 22, 24, 30, 31, 32, 36, 40, 44, 53, 54

Fourteenth Amendment ...............................................................54

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Jacob Blankenship, requests oral argument. This appeal involves fundamental constitutional rights, the application of which may create important precedent in this Circuit. Oral argument will assist this Court in considering and addressing the arguments set forth by the parties.

## JURISDICTIONAL STATEMENT

**Basis for the District Court's Jurisdiction**

The District Court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in the United States District Court over all suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction was also conferred on the District Court by 28 U.S.C. § 1331 because the causes of action arise under the Constitution and laws of the United States.

**Basis for this Court's Jurisdiction**

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The Order appealed from is a final decision of the United States District Court.

**Timeliness of the Appeal**

The Order appealed from was entered on December 6, 2024. Pursuant to Fed. R. App. P. 4(a)(1)(A), Appellant's Notice of Appeal was due within 30 days, or no later than January 6, 2025. Appellant's Notice of Appeal was filed on January 2, 2025. Thus, this appeal is timely.

**Final Order**

This appeal is from a final decision of the United States District Court disposing of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

This appeal addresses whether the District Court erred by granting Metro's and Young's Motions for Summary Judgment and denying Blankenship's Motion for Summary Judgment. Specifically, whether the District Court erred:

(1)    in not finding that the area where Blankenship was arrested (the "arrest area") was a traditional public forum;

(2)    in finding that Metro and Young did not violate Blankenship's First Amendment rights;

(3)    in finding that Metro and Young did not violate Blankenship's Due Process rights;

(4)    in not finding that Metro is liable under *Monell*;

(5)    in finding that Young is protected by qualified immunity.

## STATEMENT OF THE CASE

Appellant, Jacob Blankenship ("Blankenship") regularly shares his religious message in public places. Blankenship shares his message peacefully by distributing literature, displaying signs, preaching with his voice, often with amplification, and engaging in one-on-one conversations with people. (Declaration of Jacob Blankenship ("Blankenship Dec."), RE-59-1, PageID# 856).

Appellee Louisville-Jefferson County Metro Government, Kentucky ("Metro") adopted its Code of Ordinances ("Code"), which defines "public assembly" in § 100.01: "Any meeting, picket line, rally, or gathering of more than 25 persons for a common purpose as a result of prior planning which interferes with the normal flow or regulation of pedestrian or vehicular traffic, including emergency vehicles, upon or within any public area within Jefferson County. For purposes of this chapter, a community fair shall not be deemed to be a public assembly." (Code, RE-59-2, PageID# 859). The Code provides, in relevant part, in § 100.02: "No person shall participate or take part in, promote, organize, form, hold or assist in organizing any parade or public assembly within Jefferson County unless a permit has been obtained from the Licensing and Permit Division designee." (RE-59-2, PageID# 860). Chapter 100 provides the required procedure for obtaining a public assembly permit. (RE-59-2, PageID# 860). Metro's interpretation and application of the Code is referred to herein as the "Policy."

In 2022, Churchill Downs Racetrack, LLC ("Churchill Downs") applied for a permit pursuant to the Code for an event to be conducted in May 2022. (Deposition of Doug Sweeney as Rule 30(b)(6) witness for Louisville-Jefferson County Metro Government ("Metro Depo."), RE-59-3, PageID# 865); Permit Application, RE-58-1, PageID# 749-779). In April 2022, Metro issued a permit to Churchill Downs pursuant to the Code (Event Permit, RE-59-4, PageID# 878-880).

On May 7, 2022, the Kentucky Derby took place at Churchill Downs. (Metro Depo., RE-59-3, PageID# 865). On that day, Blankenship was exercising his constitutional rights to freedom of speech and free exercise of religion by peacefully sharing his message outside Churchill Downs, on Central Avenue between 3rd Street and 4th Street. (Blankenship Dec., RE-59-1, PageID# 856). He expressed his message on that day by preaching to the crowds, by engaging individuals in one-on-one conversation, and by distributing literature. (*Id.*). This area is public property, and is not owned by Churchill Downs. (Metro Depo., RE-59-3, PageID# 867).

On May 7, 2022, there was a "No Trespassing" sign placed on Central Avenue at 3rd Street. Specifically, the sign read: "No trespassing, valid credentials only beyond this point. Consent to search a property or person before entering." (*Id.* at 876; Photograph of No Trespassing Sign, RE-59-5, PageID# 881-882). However, the area did not require a ticket, as no one was present to check for tickets. Instead, members of the public walked freely into the area without anyone hindering or even

speaking with them. At no point was a ticket ever required to be presented to be in the area. (Blankenship Dec., RE-59-1, PageID# 857).

While Blankenship was peacefully sharing his message, several uniformed Kentucky State Police ("KSP") troopers/officers, including Appellee Elliott Young ("Young"), approached, told Blankenship that he had been warned that he could not be there, and placed him under arrest. (*Id.*). In fact, Blankenship was never given any warning prior to his arrest. (*Id.*). Young arrested Blankenship for criminal trespass. (*Id.*). A KSP officer told Blankenship that the area where he was located was not public, but was private property. (*Id.*). The Uniform Citation given to Blankenship stated that he "was remaining unlawfully upon **premises of Churchill Downs**. The above was instructed to leave by security **as well as Churchill Downs staff**. . . ." (Uniform Citation, RE-59-6, PageID# 883-884) (emphasis added).

Major Matt Johnson ("Johnson") was the commanding officer for the KSP security detail at the 2022 Kentucky Derby. (Deposition of Matt Johnson ("Johnson Depo"), RE-59-7, PageID# 888). Johnson testified that "Churchill Downs was granted a permit to exercise authority over [the permitted] areas." (*Id.* at 889). This authority included the right to "limit access." (*Id.*). Johnson testified that Churchill Downs could have someone removed for any reason. (*Id.* at 889-890). According to Johnson, this was by virtue of Churchill Downs's permit, and that it would be law enforcement's responsibility to carry out Churchill Downs's request to have

someone removed. (*Id.* at 890). Johnson testified that Churchill Downs's authority extended to the other side of Central Avenue. (*Id.* at 891). He stated that, prior to the arrest of Blankenship for trespass, he confirmed with Churchill Downs staff that they had advised Blankenship that he must leave. (*Id.* at 892-893). He stated that Blankenship was trespassing because "it's a private event on private property for the purposes of this." (*Id.* at 893-894; *see also* 896). Blankenship was removed pursuant to Churchill Downs's authority over the area by virtue of the permit. (*Id.* at 895). Johnson gave the directives to the KSP officers that removed Blankenship and his colleagues based on his communication with Churchill Downs staff. (*Id.* at 897).

Johnson's testimony is consistent with Young's testimony. Young testified with respect to the streets and sidewalks leading to the racetrack: "If [Churchill Downs] had a permit that made it Churchill Downs property, it was my understanding that, yes, they had the ability to" trespass individuals. (Deposition of Elliott Young ("Young Depo."), RE-55-2, PageID# 379). He testified that "[t]o my knowledge, if [Churchill Downs] did not wish someone to remain on their premises and they remained, they would be violating a criminal trespass, third degree, by remaining unlawfully." (*Id.* at 380). He stated his understanding that the area covered by the permit was actually private property. (*Id.* at 380-81, 387-88, 407). Young testified that the complaint that led to Blankenship's arrest for trespass

originated with Churchill Downs, was given to Johnson, and then Johnson informed Young. (*Id.* at 445).

Young testified that, in 2024, law enforcement encountered other individuals preaching and handing out literature. (*Id.* at 427-29). Law enforcement took no action against these individuals. (*Id.* at 430). Young explained that the difference between these individuals and Blankenship was that the individuals in 2024 were not using loudspeakers and "were on public property, not Churchill Downs property." (*Id.*). He then stated that the loudspeaker had nothing to do with his arrest of Blankenship. (*Id.* at 431).

Captain Jeremy Smith, who was the security detail commander for the 2022 Kentucky Derby, testified that Churchill Downs informed KSP that it had the authority to exclude or trespass individuals. (Deposition of Jeremy Smith ("Smith Depo."), RE-59-9, PageID# 916, 917). Ball, head of security for Churchill Downs, told Johnson, Smith, and Lieutenant Brad Riley "that there was a group of individuals that were on the sidewalk in permitted space that have been told to leave, and were trespassed by Churchill Downs security staff, and that they were not leaving," and asked KSP for assistance in removing them. (*Id.* at 918; *see also* 924). If Churchill Downs had not had a problem with Blankenship and his group being there, KSP would have had no reason to remove them. (*Id.* at 925).

Smith testified that the area "is not public . . . . It's permitted—" (*Id.* at 926). Smith testified that Churchill Downs had the authority to remove or trespass anyone from the permitted area for any reason because they had posted a sign. (*Id.* at 919-920). Smith did not see anyone checking for tickets at the signed area. (*Id.* at 921). KSP would have had to check with Churchill Downs to determine whether someone was unauthorized. (*Id.* at 922). Smith testified that, when there is no event, Central Avenue is public, but on May 7, 2022, it was not public, because of Churchill Downs's permit. (*Id.* at 923).

On May 6, 2022, Joseph Estephane was preaching near the Churchill Downs stadium when he was told by security that he could not be there. (Declaration of Joseph Estephane ("Estephane Dec."), RE-59-10, PageID# 928). Johnson told Estephane that he had to be in a particular "zone," and that he would find signage marking the "zone." (*Id.* at 929). Estephane was unable to find any sign, but began preaching on Central Avenue between 3rd Street and 4th Street, approximately half a mile down the road from where he had interacted with Johnson. (*Id.*). While he was preaching, several Metro Police officers passed him and allowed him to continue preaching where he was. (*Id.*). Estephane reasonably believed that he was permitted to preach at that location. (*Id.*). In fact, that location was closer to the racetrack than the spot where Blankenship was arrested on May 7. (*Id.* at 930). At no time, on May 6, 2022, did anyone ask Estephane to show a ticket, or tell him that

he needed a ticket to be where he was. He never saw anyone checking for tickets anywhere he was located that day. (*Id.*).

Estephane was also arrested on May 7, 2022. (*Id.*). Johnson told Estephane that he had told him the day before that he could not be there, despite the fact that, the day before, he was allowed to preach closer to the racetrack without being stopped. (*See id.*). At no point on May 7, 2022, did anyone ask Estephane for a ticket or tell him that he needed a ticket. He never saw anyone that day checking for tickets anywhere he was located that day. (*Id.*). Estephane had preached at the Kentucky Derby for the previous approximately six years, without being restricted in any way or having any issue with law enforcement. (*Id.* at 928). When Estephane asked Johnson what had changed from previous years, Johnson told him that the county attorney had been "conferenced." (*Id.* at 929).

Doug Sweeney, Metro's special events manager and Rule 30(b)(6) witness, testified that he did not recall any changes to Churchill Downs's application for a permit for the 2022 Kentucky Derby from previous years. (Metro Depo., RE-59-3, PageID# 866). Sweeney testified that, by virtue of obtaining Metro's permit, Churchill Downs controls the permitted property, and can operate as if it were their property. (*Id.* at 867). It is treated "like their private property." (*Id.* at 875). He testified that the permit covered Central Avenue outside the signed area. (*Id.* at 868). Sweeney stated that Churchill Downs could have placed the sign farther away if they

so chose, and that "[i]t was an arbitrary point at their discretion." (*Id.* at 868-869; *see also* 873). He testified that, if Churchill Downs excluded people selectively, it would be a violation of the law, "but not necessarily the permit." (*Id.* at 869). Any violation of the law would have to be addressed by law enforcement. (*Id.* at 869-870).

Sweeney testified that Churchill Downs had the authority to prohibit people from accessing Wagner's Pharmacy, a private business, via Central Avenue in the permitted area, because "[t]hey are setting the rules for which you can enter." (*Id.* at 871-872). He speculated that Churchill Downs would then give alternate directions to Wagner's. (*Id.*). Sweeney stated that it would not violate the permit for Churchill Downs to establish a ticketed area, and then not check for tickets, allowing some people in without tickets. (*Id.* at 873-874). Sweeney testified that picketing is a protected First Amendment right which does not require a permit. (*Id.* at 875). He stated that Metro's and Churchill Downs's policies with respect to the permit were the same in 2022 as in previous years. (*Id.* at 876). Sweeney testified that Metro grants a permit, and the permittee can "use that property as their own," whether to require tickets or not. (*Id.* at 877). Metro apparently has no exclusive-use and non-exclusive-use permits. (*See id.*).

Josh Ball, Churchill Downs's Rule 30(b)(6) witness, testified that Metro was involved in creating the policy that established the ticketed area on Central Avenue.

(Deposition of Josh Ball as Rule 30(b)(6) witness of Churchill Downs ("Churchill Downs Depo."), RE-58-2, PageID# 784). Specifically, representatives from Emergency Services and Metro Police were involved. (*Id.*). Further, Metro Police was the primary law enforcement agency on the scene. (*Id.* at 794, 796). Metro Police Chief Shields was involved in the planning process for security at the Derby. (*Id.* at 796). Metro Police, Special Events, and EMS were involved in creating a comprehensive plan for security related to the Derby. (*Id.* at 795-796; Interagency Public Safety Committee Kickoff, RE-58-3, PageID# 825-827).

Ball testified that credentials were issued to "employees, staff, vendors, [and] contractors" during Derby week. (Churchill Downs Depo., RE-58-2, PageID# 785). These credentials are unrelated to the tickets required for guests to attend Derby events. (*Id.* at 791). The "valid credentials" referenced in the "No Trespassing" sign on Central Avenue referred to these credentials. (*Id.* at 786). Ball did not know how a member of the public would know that they were required to have a ticket to enter the ticketed area. (*Id.* at 797-798).

Churchill Downs knew that it had the right to exclude people from the permitted area because it consulted with Metro Police contacts. (*Id.* at 787). Those contacts worked with the County Attorney's office to ensure that the appropriate verbiage was on the sign. (*Id.*). In fact, Metro Police told Churchill Downs what

verbiage to use on the sign. (*Id.*). This sign was an accurate description of Churchill Downs's policy regarding public access to the permitted area. (*Id.* at 797).

Ball testified that, based on Metro's permit, Churchill Downs had the same amount of control over the permitted area that it had over its own property. (*Id.* at 788). He testified that a private business, Wagner's Pharmacy, was inside the permitted area, and was open for business during Derby weekend. (*Id.*). Ball testified that, if he saw someone enter the permitted area on their way to Wagner's, he would not check them for a ticket. (*Id.* at 788-789). Law enforcement could not trespass an unticketed or uncredentialed individual without direction from Churchill Downs. (*Id.* at 790). According to Churchill Downs's permit application, prepared by Ball, the sidewalk on Central Avenue only required tickets between 4th Street and 9th Street. (*Id.* at 792; Permit Application, RE-58-1, PageID# 776). Thus, any area east of 4th Street did not require a ticket, even though the area may still have been permitted. (Churchill Downs Depo., RE-58-2, PageID# 793, 799; Deposition of Josh Ball ("Ball Depo."), RE-58-4, PageID# 846, 849).

Ball, in his individual capacity, testified that he did not know of any distinction between an exclusive-use permit and a non-exclusive use permit. (Ball Depo., RE-58-4, PageID# 845). He testified that, based on the permit issued by Metro, Churchill Downs "could give someone a criminal trespass warning," and then law enforcement would enforce the trespass. (*Id.* at 847). He stated that they were

trying to get the right verbiage for the sign, and his understanding was that the events coordinator from Metro Police worked with the County Attorney's office to come up with the language for the sign. (*Id.* at 848).

Ball confirmed that LMPD was the primary law enforcement agency at the Derby, and that LMPD Special Events took the lead in the briefing of security personnel. (*Id.* at 850). LMPD had to sign off on the overall security plan. (*Id.* at 851). Further, Churchill Downs had a lengthy meeting with Chief Shields, and "the whole process was completely changed because of Chief Shields' instruction. So, what had happened for apparently decades prior was completely changed in 2022.·So, we had to restrategize everything at the direction of Chief Shields." (*Id.*). Churchill Downs's LMPD Special Events coordinator advised Churchill Downs that they had to give a criminal trespass notice, and provided the language for the "No Trespassing" sign. (*Id.* at 852).

On September 3, 2024, Blankenship filed a Motion for Summary Judgment (RE-58), as did Metro (RE-52) and Young (RE-55). On December 6, 2024, the District Court entered a Memorandum Opinion & Order denying Blankenship's Motion for Summary Judgment and granting Metro's and Young's Motions for Summary Judgment (the "Order") (RE-101, PageID# 1316-1339). The District Court entered a Judgment on the same day. (RE-102, PageID# 1340). Blankenship timely filed his Notice of Appeal on January 2, 2025. (RE-103, PageID# 1341-1343).

For the reasons that follow, the District Court erred by granting Metro's and Young's Motions for Summary Judgment, and by denying Blankenship's Motion for Summary Judgment. Accordingly, this Court should reverse.

# SUMMARY OF THE ARGUMENT

The District Court erred in not determining the nature of the forum where Blankenship was arrested. The area was a traditional public forum. It was a public street and sidewalk open to the public. The permit Metro granted to Churchill Downs was not an exclusive-use permit; thus, Churchill Downs was not authorized to require tickets to enter the permitted area. Metro erroneously allowed them to do so anyway, thus violating its own permit, and granting a private entity unbridled discretion to control public property. Even if the permit was exclusive, Churchill Downs did not, in fact, implement any ticket requirement. No one ever checked for tickets at the entrance to the area, and the public was allowed to come and go unhindered. No one ever asked Blankenship if he had a ticket or told him that he needed one to access the area.

The restriction on Blankenship's speech does not survive constitutional scrutiny. The removal was not content neutral. The public was allowed to access the area unhindered. Blankenship was specifically removed because Churchill Downs did not want him there. As in *Parks v. City of Columbus*, it is difficult to conceive that Blankenship was removed for any reason other than the content of his message. Thus, strict scrutiny applies. Because Metro had no compelling interest served by removing Blankenship, the removal fails strict scrutiny.

Even if the restriction on Blankenship's speech was content neutral, it does not satisfy intermediate scrutiny. Metro's abdication of authority over public property to Churchill Downs, allowing them to limit access at their whim, does not satisfy a significant government interest. No ticketed area was actually created, and the public was allowed into the area freely and unhindered.

Any government interest was not narrowly tailored. By excluding Blankenship simply because he was unwanted, Metro and Young burdened substantially more speech than necessary. Indeed, they prohibited any speech by Blankenship in a public forum. The District Court found that creating an event plan was necessary to manage the Derby Day crowds. However, any such plan did not include a ticketed area, as no one checked for tickets, and the public entered the area unhindered. There is no evidence that Blankenship was impeding ingress or egress. In any event, Blankenship was arrested outside the area Churchill Downs intended to be ticketed.

The restriction on Blankenship's speech did not leave open ample alternative channels of communication. Blankenship was arrested and removed from the area, with no further opportunity to speak. Even had he been given the opportunity to move outside the area, he would have only been able to reach a smaller audience, defeating the purpose of him preaching outside the event.

Even if this Court holds that the arrest area was a limited public forum, the restriction on Blankenship's speech does not survive constitutional scrutiny because it was not reasonable or viewpoint neutral. Blankenship was removed because Churchill Downs did not want him there. This can only be interpreted as based on the viewpoint of his message. Further, the complete abdication of all authority over public streets and sidewalks to a private entity was not reasonable.

Metro's Code and Policy granted unbridled discretion to Churchill Downs. Neither Metro's Code or Policy, nor the permit itself, gave Churchill Downs any standards relating to its control over the property. Instead, Churchill Downs was allowed to treat the property as its own private property, excluding anyone it wished for any reason, including unlawful discrimination.

Metro is liable for the constitutional violations under *Monell*. By virtue of its permit, Metro ceded control over public streets and sidewalks to Churchill Downs, giving them unbridled discretion. This cession was pursuant to Metro's Code and Policy. Metro allowed Churchill Downs to exert control even beyond the parameters of their own permit application, ticketing an area outside that which they requested. Further, Metro provided the very language of the No Trespassing sign placed by Churchill Downs. Metro was involved in creating the policy that established the ticketed area, as well as in creating the security plan for the area.

Metro's permitting scheme violated Blankenship's due process rights. Metro's Policy is vague, and allows for unbridled discretion in enforcement. This unbridled discretion resulted in Blankenship's arrest and removal from a traditional public forum, in violation of his First Amendment rights.

Young is not entitled to qualified immunity. First, the District Court's finding of qualified immunity only applied to the false arrest claim. Further, qualified immunity only applies to claims for damages – not for claims for declaratory or injunctive relief. Thus, the existence of probable cause cannot absolve Young of liability under those claims.

## ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*.

*Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004).

> Summary judgment is proper where the pleadings, depositions, answers
> to interrogatories, and admissions on file, together with the affidavits,
> if any, show that there is no genuine issue as to any material fact and
> that the moving party is entitled to a judgment as a matter of law. When
> presented with a motion for summary judgment, the court views the
> evidence and draws all reasonable inferences in favor of the
> nonmovant. In effect, any direct evidence offered by the plaintiff in
> response to a summary judgment motion must be accepted as true.

*Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007) (internal citations and quotation marks omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). This Court reviews the denial of a motion for summary judgment based solely on legal grounds *de novo*. *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 235-236 (6th Cir. 2003).

## II.  FIRST AMENDMENT STANDARD

The Supreme Court of the United States has held that courts must apply a three-pronged analysis for evaluating free speech cases: (1) determine if the speech in question is protected under the First Amendment; (2) identify the nature of the forum in which the speech would take place; and (3) assess whether the

government's exclusion of the speech from the forum is justified by the requisite standard. *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 797 (1985).

Here, as the District Court correctly noted, Metro and Young do not dispute that Blankenship's speech was protected by the First Amendment. (Order, RE-101, PageID# 1324). The District Court did not make a finding as to the nature of the forum, concluding that, because the restriction on Blankenship's speech was content-neutral, the nature of the forum was not dispositive. (*Id.* at 1327-1330). However, because the restriction on Blankenship's speech was not content-neutral (*see infra*), in a traditional public forum, the restriction is subject to strict scrutiny. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (holding that restrictions premised on content of speech and that occur in traditional public fora are presumptively invalid); *Gay and Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 366 (8th Cir. 1988) ("Content-based discrimination can be justified only if the government demonstrates that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest" (internal citation omitted)). This standard is "extremely difficult" for a government entity to meet. *Id.* Metro must show its regulation is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

## III. THE DISTRICT COURT ERRED BY FAILING TO FIND THAT THE ARREST AREA WAS A TRADITIONAL PUBLIC FORUM

While the District Court opined that "[i]t is unclear whether Blankenship was arrested in a traditional public forum or limited public forum," it concluded that, because it found that the restriction on Blankenship's speech was content neutral, "it makes no difference whether Blankenship was arrested in a traditional or limited public forum." (Order, RE-101, PageID# 1327, 1329). Thus, the Court applied intermediate scrutiny. (*Id.* at 1330ff).[1]

Because, as set forth below, the District Court erred in finding that the restriction on Blankenship's speech was content neutral, it erred in not determining the nature of the forum, which is a traditional public forum.

### A. The Arrest Area Was A Traditional Public Forum

First Amendment precedent contemplates three types of government property – or fora –in which speech occurs: (1) traditional, (2) designated or limited, and (3) non-public. *See Cornelius*, 473 U.S. at 802. It is well-settled that public streets,

---

[1] The District Court applied the reasonable time, place, and manner standard. (Order, RE-101, PageID# 1330-32). However, in a limited public forum, a restriction on speech must be reasonable and viewpoint neutral. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). In *Saieg v. City of Dearborn*, 641 F.3d 727, 734-35 (6th Cir. 2011), this Court seemed to state that the reasonable time, place, and manner standard and the reasonableness standard were the same. *See also Spingola v. Vill. of Granville*, 39 Fed. Appx. 978, 983 (6th Cir. 2002). To the extent these are different standards, Metro's and Young's conduct fails both, as set forth below.

public sidewalks, public squares, public parks, public grounds, and other public rights-of-way are the "quintessential" public fora. *See Frisby v. Schultz*, 487 U.S. 474, 481 (1988). The First Amendment guarantees the utmost protection in traditional public fora.

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. C.I.O.*, 307 U.S. 496, 515 (1939).

The Supreme Court has been consistently clear that traditional public fora "occupy 'a special position in terms of First Amendment protection,'" and that "the government's ability to restrict expressive activity [in them] 'is very limited.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *United States v. Grace*, 461 U.S. 171, 180, 177 (1983)). The area where Blankenship was expressing his message was a sidewalk on Central Avenue between 3rd Street and 4th Street. (Blankenship Dec., RE-59-1, PageID# 856). Central Avenue is a public street. (Young Depo., RE-55-2, PageID# 388; Smith Depo., RE-59-9, PageID# 923; Metro Depo., RE-59-3, PageID# 867). The public streets and sidewalks in the City are traditional public fora. It was in a public forum, specifically a public sidewalk and street, that Blankenship was peacefully exercising his First Amendment rights on May 7, 2022.

### 1. Metro's Permit Was Not Exclusive

The argument that the arrest area was a limited public forum is dependent upon the conclusion that it was a ticketed area. While the area was covered by a permit granted by Metro, the permit was not exclusive. (Metro Depo. RE-59-3, PageID# 877; Ball Depo., RE-58-4, PageID# 845). A non-exclusive permit does not authorize a permittee to exclude members of the public from public property. *See Parks v. City of Columbus*, 395 F.3d 643, 653 (6th Cir. 2005) (where the city-issued permit was non-exclusive, "[t]he streets remained a traditional public forum"); *Parks v. Finan*, 385 F.3d 694, 704-05 (6th Cir. 2004); *McGlone v. Metro. Gov't of Nashville and Davidson Co., Tenn.*, No. 17-6291, at *8 (Sep. 19, 2018) (6th Cir. 2018). The District Court stated, in a footnote, that whether the permit was exclusive or non-exclusive was not determinative. (Order, RE-101, PageID# 1326 n.8). However, it is determinative, because a non-exclusive permit does not grant Churchill Downs authority to require tickets. By allowing them to do so anyway, Metro violated its own permit, granting unbridled discretion over public property to a private entity, who then excluded constitutionally protected speech.

The District Court also downplayed the distinction between exclusive and non-exclusive permits by stating it "appears to come from the facts in *Parks* [*v. City of Columbus*], not free speech jurisprudence." (Order, RE-101, PageID# 1325 n.8). In fact, this Court recognized the distinction before *Parks v. City of Columbus*. In

*Parks v. Finan*, 385 F.3d at 704-05, this Court held that a permitting scheme requiring an individual to obtain a permit to speak on public property, while another organization had a permit to use the property, violated the Free Speech clause of the First Amendment. In doing so, this Court distinguished *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996): "this is not a situation where one organization has been given an exclusive permit to use grounds for a limited period. In *Sistrunk*, the permit specifically provided that the use of the grounds was limited to the members of the permittee organization and their invitees." *Id.* at 704. Similarly, after *Parks v. City of Columbus*, this Court decided *McGlone v. Metro. Gov't of Nashville and Davidson Co.*, No. 17-6291. This Court again distinguished *Sistrunk*: "*Sistrunk* concerned a permit that specifically granted the Bush-Quayle '92 Committee exclusive use of the grounds for their members and their invitees. That is not this case. While the area was permitted, the permit did not restrict access to the sidewalk to a special class of people . . . ." *Id.* at *8. Thus, as this Court has held on multiple occasions, the distinction between exclusive-use and non-exclusive-use permits may be a determinative issue in free speech cases.

Thus, Churchill Downs, the permittee, was not authorized to require tickets to access public property covered by its permit. The public streets and sidewalks on which Blankenship was engaging in his constitutionally-protected conduct are a traditional public forum, and remain so even when a horse race happens to be taking

place. Metro does not have the authority to suspend the public nature of the forum and assign responsibility and control to a private entity. *Parks v. City of Columbus*, 395 F.3d at 652.

"[A] suburban township [] may not by its own *ipse dixit* destroy the public forum status of streets and parks which have historically been public forums . . . ." *United States Postal Service v. Council of Greenberg Civic Ass'n*, 453 U.S. 114, 133 (1981) (internal quotation marks omitted). *See Grace*, 461 U.S. at 175 (government may not "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property"). Metro unlawfully ceded control of public property to a private entity by means of a temporary, non-exclusive permit.

A handful of cases have indicated that a private permittee can exclude members of the public from a traditional public forum if the permit for use is exclusive, allowing the permittee to limit attendance to invitees only, such as with a family reunion or a wedding. *See, e.g., Sistrunk*, 99 F.3d at 196. However, appellate courts, including this Court, have uniformly held that streets, sidewalks, and parks remain traditional public fora during festivals and events run by private permittees so long as the venue remains free and open to the public. *See Johnson v. Minneapolis Park & Rec. Bd.*, 729 F.3d 1094, 1098-99 (8th Cir. 2013) (noting public park remained a traditional public forum during festival hosted by Twin Cities Pride);

*Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012) ("The city streets are a traditional public forum, and their character as a public forum is retained even though they are used for a public festival sponsored by a private entity"); *Startzell v. City of Philadelphia*, 533 F.3d 183, 196 (3d Cir. 2008) ("The issuance of a permit to use this public forum does not transform its status as a public forum"); *Gathright v. City of Portland*, 439 F.3d 573, 578-79 (9th Cir. 2006) (holding that issuance of a permit to a private entity did not change public forum status because the event remained open to the public); *Parks v. City of Columbus*, 395 F.3d at 652 (holding that where a speaker spoke at an arts festival free and open to the public, "the streets remained a traditional public forum notwithstanding the special permit that was issued to the Arts Council").[2]

---

[2] A limited public forum is created by opening a nonpublic forum for limited purposes. "A limited public forum can **only** be created 'by intentionally opening a nontraditional forum for public discourse.'" *Nat'l Federation of the Blind of Mo. v. Cross*, 184 F.3d 973, 982 (8th Cir. 1999) (quoting *Cornelius*, 473 U.S. at 802) (emphasis added). *See also Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 n.11 (2010) ("governmental entities establish limited public forums by opening property 'limited to use by certain groups or dedicated solely to the discussion of certain subjects'" (quoting *Pleasant Grove City v. Summum*, 129 S.Ct. 1125, 1132 (2009)).

This Court has left open the question whether a municipality may **ever** reduce a traditional public forum to a limited public forum. "Whether a municipality has the power to transform a traditional public forum into a limited or non-public forum is an open question. *See Parks*, 395 F.3d at 650 (noting that "other jurisdictions have been conflicted as to whether a city may transform a traditional public forum")." *Bays v. City of Fairborn*, 668 F.3d 814, 821 (6th Cir. 2012). Blankenship urges this Court to address the issue here, and rule that a city may not transform a traditional

In *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1081 (N.D. Fla. 2016), the court addressed a situation involving an individual sharing his faith at a motorcycle rally conducted in a public park by a private organization in Panama City Beach, Florida. The court held that the area in question was a traditional public forum. *Id.* at 1098. The court held: "The City's argument that the 'exclusive' permit operates like a lease to transform the Site into purely private property, giving the permit holder all the rights and privileges of private property ownership during the term of the permit, is entirely without merit and is not well taken." *Id.* at 1101. The argument is even less well-taken in the instant case, where Metro's Rule 30(b)(6) witness testified that Metro's permit, which was **not** exclusive, allowed Churchill Downs to treat the property as private. The *McMahon* court held further: "The City's stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling." *Id.* at 1106. The same is true here.

Notably, the *McMahon* court distinguished between ticketed and non-ticketed events. *Id.* at 1099. As set forth below, the arrest area was not ticketed.

---

public forum into a limited public forum. In any event, even if it did have the power, Metro did not transform the arrest area into a limited public forum because the permit was non-exclusive and the area was not ticketed.

## 2. The Arrest Area Was Not Ticketed

Even if Churchill Downs had an exclusive permit, it did not require tickets to enter the arrest area. No one was checking for tickets, and Blankenship was never asked to show a ticket or told that he needed a ticket. (Blankenship Dec., RE-59-1, PageID# 857; Young Depo., RE-55-2, PageID# 387). The public was entering the area freely, walking past the "No Trespassing" sign without anyone stopping them, speaking to them, or checking for tickets. In fact, during the entire time Blankenship was in the area, no one affiliated with Churchill Downs was ever present near the sign. (Blankenship Dec., RE-59-1, PageID# 857). Further, the arrest area was not ticketed, according to Churchill Downs's own permit application. The permit application provided that the area from 9th Street, on the west, to 4th Street, on the east, was to be ticketed. (Churchill Downs Depo., RE-58-2, PageID# 792; Application, RE-58-1, PageID# 776). Blankenship was standing east of 4th Street, between 3rd and 4th Street, when he was arrested. Thus, even according to the terms of Churchill Downs's own permit application, the area where Blankenship was standing was not ticketed.

The District Court cited *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019), finding that the facts were "nearest to this case." (Order, RE-101, PageID# 1326). However, as the District Court also noted, "it appears likely that those

fairgrounds, unlike the area at issue here, were physically inaccessible without paying admission." (*Id.*). Thus, the District Court correctly distinguished *Hartman*.

While the District Court concluded that "the permit application did not irrevocably dictate where the ticketed area must be," and that "Metro allowed Churchill Downs to form, within the permitted area, whatever ticketed area it deemed appropriate," (Order, RE-101, PageID# 1324), Metro has argued in this litigation that "Metro Government was not involved in any way in the placement of those signs or authorized the signs to be placed at 3rd Street. Churchill Down's own representative even testified that any area east of 4th Street did not require a ticket. Yet, Churchill Downs and KSP enforced the ticket requirement on Plaintiff without any approval from Metro Government." (Metro Government's Response, RE-74, PageID# 1119) (internal citation omitted)). Thus, Metro concedes that Blankenship was not arrested in the ticketed area.

Here, while the Kentucky Derby itself is ticketed, the public street and sidewalk where Blankenship was preaching was not ticketed. The arbitrary placement of a "No Trespassing" sign, by a private entity, did not transform a traditional public forum into a limited public forum. Further, even if it did, the area was not ticketed because there was no one at the entrance, or anywhere in the area, checking tickets or requiring anyone to show a ticket to enter. At the very least, there

is a genuine issue of material fact as to whether there was a ticketed area, and whether Blankenship was in it when he was arrested.

Young, acting under color of law, enforced a request from Churchill Downs to move Blankenship from within the area outside Churchill Downs, which included public sidewalks and streets. (Young Depo., RE-55-2, PageID# 416). Churchill Downs did not have the authority to direct Young to arrest Blankenship absent Metro's Code and Policy. Moreover, no one was required to show a ticket to enter the area, but rather, it was open to the public. Without question, Metro's and Young's enforcement of the Policy unlawfully censored speech and religious exercise activities in a traditional public forum.

## IV.  METRO AND YOUNG VIOLATED BLANKENSHIP'S FIRST AMENDMENT RIGHTS

### A.  Metro's And Young's Enforcement Of The Policy Does Not Survive Constitutional Scrutiny

In public fora, "the government's ability to permissibly restrict expressive conduct is very limited." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (citations omitted); *see also Gaudrya Vaishrava Soc'y v. City and County of San Francisco*, 952 F. 2d 1059, 1065 (9th Cir. 1991) (within "traditional public fora, the government's authority to restrict speech is at its minimum"); *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("regulation of speech on government property that has traditionally been available for public expression is

subject to the highest scrutiny"). Once it is determined that the speech is protected and that the speech is being conducted in traditional public fora, the powers of governing authorities to "limit expressive activities are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

When a government restricts speech in a public forum, "[i]t is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy. There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve that goal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 680 (1994) (O'CONNOR, J., concurring in part and dissenting in part). Moreover, the government defendant bears the burden of demonstrating that its enactment meets constitutional requirements. *See Davenport v. City of Alexandria*, 710 F.2d 148, 152 n.8 (4th Cir. 1983) ("a governmental entity must always be prepared to come forward with a strong factual justification for its actions").

In the realm of First Amendment rights, the presumption of constitutionality usually accorded legislative decisions does not apply. *See Hickory Fire Fighters Ass'n v. City of Hickory, N.C.*, 656 F.2d 917, 923 (4th Cir. 1981); *Blasecki v. City of Durham, N.C.*, 456 F.2d 87, 91 (4th Cir. 1972). In fact, the Supreme Court held long ago that "[t]he presumption rather is against the legislative intrusion into the[] domains" of "the rights of conscience, expression and assembly protected by the

[First] Amendment . . . ." *United States v. Congress of Industrial Organizations*, 335 U.S. 106, 140 (1948). In *Durham v. Brock*, 498 F. Supp. 213, 221 (M.D. Tenn. 1980), the Court refused to entertain a presumption of constitutionality as to challenged regulations because of the "preferred position of the first amendment . . . ." The court held that "[i]t is also inappropriate to apply such a presumption where the practical effect of so doing would be to greatly reduce the burden of proof on the part of the state in justifying its speech restrictions." *Id.* Clearly, in the instant case, any presumption that Metro's and Young's actions are constitutional would greatly reduce their burden of proof in justifying the restrictions on Blankenship's speech, and thus does not apply.

Short of total exclusion of the speaker, the government may impose reasonable time, place, and manner restrictions on speech in traditional public fora. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In order for a time, place, and manner restriction on expressive activity in a traditional public forum to pass constitutional muster, the restriction must: (1) be content-neutral; (2) serve a significant governmental interest; (3) be narrowly tailored to serve that interest; and (4) leave open ample alternative channels of communication. *See Grace*, 461 U.S. at 177.

### 1. The Exclusion Of Blankenship From The Permitted Area Was Not Content Neutral

Restrictions premised on content of speech in traditional public fora are

presumptively invalid. *R.A.V.*, 505 U.S. at 382. "Content-based discrimination can be justified only if the government demonstrates that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest." *Gay and Lesbian Students Ass'n*, 850 F.2d at 366 (internal citation omitted). This standard is "extremely difficult" for a government entity to meet. *Id.* Metro must show its regulation is "the least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478.

Metro's censorship, instilled in the permitting process, empowers a permittee unbridled discretion to exclude disfavored people and speech from the confines of the permitted space. In turn, Churchill Downs exercised this privilege to expel Blankenship due to the content of his message.

A content-neutral restriction must be justified without reference to the content of the expression. *Boos*, 485 U.S. at 320. Consequently, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County, Ga. v. The Nationalist Movement*, 505 U.S. 123, 134 (1992). Metro facilitates banishments from permitted property based on reaction of listeners – the organizer and whoever complains to it – and with the expulsion of Blankenship this dubious prospect became a reality. Metro enforced Churchill Downs's wishes to exclude Blankenship, arresting him for trespass, simply because Churchill Downs did not want him there. (*See* Young Depo., RE-55-2, PageID# 393; 418-19).

In *Parks v. City of Columbus*, the plaintiff (Parks), who was wearing a sign and distributing literature at a public festival, was removed from a festival because "the sponsor of the event did not want him there." 395 F.3d at 646. Finding this restriction content-based, this Court concluded:

> There is no evidence that the Arts Council had a blanket prohibition on the distribution of literature or that others engaging in similar constitutionally protected activity were removed from the permitted area. While the district court did not reach the question of whether the removal of Parks was based on the content of his speech, under these circumstances **we find it difficult to conceive that Parks's removal was based on something other than the content of his speech**.

*Id.* at 647 (emphasis added). *See also Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 247 (6th Cir. 2015) (holding ejection of a speaker due to reactions to the speech were "decidedly content based"). The same reasoning applies with equal force here. Law enforcement expelled Blankenship solely because of listener reaction, because of content.[3]

The District Court found: "There is no genuine dispute that Blankenship and others were excluded for their lack of tickets." (Order, RE-101, PageID# 1329). This is erroneous. Right before making that statement, the Court found: "As Young understood it, Blankenship's offense was lingering in the ticketed area after being told to leave." (*Id.*). Yet no one, including Young, ever asked if he had a ticket, nor

---

[3] Notably, even if the arrest area was a limited public forum, Churchill Downs still could not exclude Blankenship based on the viewpoint of his message. *See Hartman*, 931 at 479.

did anyone ask anyone else if they had a ticket. No one ever determined that, in fact, Blankenship did not have a ticket. It is worth noting that Estephane was allowed to stay in the area the previous day, closer to the track, with no ticket. The issue was not lack of a ticket. If there was a ticket requirement, it was selectively enforced, which is evidence of unbridled discretion (*see* discussion *infra*).

The District Court relied heavily on *Reform America v. City of Detroit, Michigan*, 37 F.4th 1138 (6th Cir. 2022). (Order, RE-101, PageID# 1328-1332). However, that case is easily distinguishable: the organizer required tickets to access the restricted area. As the District Court noted, both sides in *Reform America* agreed that tickets were required. (*Id.* at 1328). Moreover, the ticket requirement was strictly enforced. At every point the plaintiffs sought to access the area, they were stopped, asked if they had a ticket, and when they stated they did not, they were told they could not enter. 37 F.4th at 1145, 1149. No one who lacked a ticket was allowed to enter the restricted area. *Id.* at 1149. Here, there is no evidence that anyone was ever checked for a ticket before entering the arrest area. Just the previous day, Estephane was allowed to remain in the area with no ticket.

There is at least a genuine issue of material fact as to whether Blankenship was removed because of the content of his message.

> ### 2. Metro Does Not Have A Compelling Interest In The Exclusion Policy Or Removing Blankenship From The Area

No compelling interest exists for the Policy that allows permittees to exclude

disfavored speech. Any interest of Metro in allowing its permittee to label Blankenship as "unauthorized" simply because he was expressing a religious message is not a compelling one. "[T]here is no constitutional right to be free from insult, and shielding [individuals] from it is not a compelling government interest." *Kirkeby v. Furness*, 92 F.3d 655, 660 (8th Cir. 1996) (citing *Texas v. Johnson*, 491 U.S. 397, 408-09 (1989) and *Cohen v. California*, 403 U.S. 15, 21 (1971)). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas*, 491 U.S. at 414. Absent a compelling interest, Metro's exclusion Policy and the ejection of Blankenship violate the First Amendment.

### 3. The Restriction On Blankenship's Speech Did Not Serve A Significant Government Interest

Even if the exclusion of Blankenship from the permitted area was content-neutral, the Policy as applied does not serve a significant governmental interest. The fear of disturbance during special events cannot justify the infringement of First Amendment rights. The Supreme Court recognized long ago:

> [U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it

> is this sort of hazardous freedom – this kind of openness – that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 508-509 (1969).

The Policy was applied to the exercise of constitutional rights. Metro delegated unfettered control over the public streets and sidewalks outside Churchill Downs during the Kentucky Derby and related events, abdicating its responsibility for public property. Metro, Churchill Downs, and KSP Troopers providing security, all (wrongly) agree that, when Churchill Downs has a permit, the permitted area becomes "private property." (Blankenship Dec., RE-59-1, PageID# 857; Johnson Depo., RE-59-7, PageID# 893-94, 896; Young Depo., RE-55-2, PageID# 379, 380-81, 387-88, 407, 430; Metro Depo., RE-59-3, PageID# 867, 875, 877; Churchill Downs Depo., RE-58-2, PageID# 788). Once in private hands, the private entity may do as it sees fit, including removing individuals it does not want there. Major Johnson, the KSP commanding officer during the Derby, and Captain Smith, the security detail commander, both stated that Churchill Downs could exclude anyone for any reason. (Johnson Depo., RE-59-7, PageID# 889-90; Smith Depo., RE-59-9, PageID# 919-20). According to Metro, this included unlawful exclusion. (Metro Depo., RE-59-3, PageID# 867). Metro wants it both ways – to attract revenue producing events to the City while simultaneously seeking to wash its hands of all responsibility to uphold constitutional rights on public property. There simply is no

plausible government interest in this abdication of authority, significant or otherwise.

The District Court found that creating a restricted area served a significant interest. (Order, RE-101, PageID# 15-16). However, again, no restricted area was created. If there was a restricted area, Churchill Downs would have required tickets to get in. No tickets were required to access the arrest area. During the entire interaction with Blankenship, no one asked him if he had a ticket or told him he needed one. There was never even anyone in the area to ask for tickets. Blankenship was not removed for not having a ticket; he was removed for his speech activity. That is the restriction on his speech, removing him, not creating the general permitted area. Removing Blankenship did not serve the interests of safety or access.

This Court's decision in *Saieg* is instructive. In that case, this Court addressed a leafletting restriction enforced on public sidewalks outside a permitted festival area. This Court held that the restriction did not serve a substantial government interest, and therefore failed intermediate scrutiny. 641 F.3d at 736. The defendants in *Saieg* listed the government interests in "relieving pedestrian overcrowding, enhancing traffic flow, minimizing threats to public safety, and limiting disorderliness at the Festival." *Id.* (internal citation and quotation marks omitted). This Court held that, with respect to the inner perimeter, these interests were "merely 'conjectural' as opposed to 'real.'" *Id.* at 737 (quoting *Turner*, 512 U.S. at 664). This

Court noted that festival organizers kept adjacent sidewalks open to public traffic. *Id.* This Court quoted *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994): "'[e]xemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the . . . rationale for restricting speech in the first place.'" *Id.* Here, no ticket requirement was ever enforced. The public came and went through the "restricted" area at will, unhindered and unquestioned. (*See* Full Preach May 7 Kentucky video ("Video"), RE-55-6, PageID# 505). Estephane was allowed to preach in the area the day before, with no ticket. Essentially, everyone except Blankenship and his group were exempt. This severely "diminish[es] the credibility of the . . . rationale for restricting speech in the first place.'" *Id.*

### 4. The Restriction On Blankenship's Speech Was Not Narrowly Tailored

Even if Metro's interest were to be deemed significant, the enforcement of Metro's permitting Policy was not narrowly tailored to serve that interest. In order for a time, place, and manner restriction to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. In *McCullen*, 573 U.S. at 486-497, the Supreme Court held that a statute that created buffer zones around abortion clinics which "protesters" were not permitted to penetrate burdened substantially more speech than necessary. The Court identified several less burdensome options the Commonwealth of Massachusetts could have taken to address its interest, including enacting new

legislation or addressing issues by existing ordinances. *Id.* at 2537-38. In short, the Court held that the Commonwealth had "available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 2539.

The fact that a government's chosen restriction is "easier" to enforce than alternatives does not satisfy the Constitution. The *McCullen* Court held that "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.* at 2540. The Court concluded that the Commonwealth had pursued its interests "by the extreme step of closing a substantial portion of a traditional public forum to all speakers. It has done so without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes. The Commonwealth may not do that consistent with the First Amendment." *Id.* at 2541.

Here, Metro has not expressed a government interest that could be narrowly tailored. It has established a Policy of ceding control over public property to a private entity when it has an event on its own property. Metro granted Churchill Downs exclusive control over public property by virtue of a non-exclusive permit. Churchill Downs exercised its exclusive control by arbitrarily placing a "No Trespassing" sign

on Central Avenue, outside the area it intended to be ticketed, despite the fact that its permit was non-exclusive. Churchill Downs then had Blankenship arrested and removed, calling him "unauthorized," despite the fact that no one ever asked him if he had a ticket. A review of the video shows that at no time was Blankenship or his group blocking ingress or egress, impeding foot traffic in the area, or otherwise disrupting the event. (Video, RE-55-6, PageID# 505). There is no evidence to suggest otherwise. Any purported requirement for a ticket or "credentials" to get past the sign clearly was a ruse, as there was never anyone checking for tickets or credentials. Young carried out this constitutional violation by arresting Blankenship because Metro gave Churchill Downs the authority to censor unattractive speech. By ceding complete control over public property to a private entity, authorizing and enforcing the exclusion of Blankenship simply because he was unwanted, Metro and Young burdened substantially more speech than necessary. Indeed, they prohibited any speech by Blankenship in a public forum.

In *McMahon*, 180 F. Supp. 3d at 1106, the court held: "The City's stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling." While the Kentucky Derby itself is not free and open to the public, the arrest area was not ticketed. Metro simply gave "unquestioning deference to the whims of" Churchill Downs, simply because they had a permit. Metro did not even attempt to narrowly tailor its deference to Churchill Downs; it was absolute.

The District Court inferred a narrowly-tailored government interest, finding that "without an event plan in place, Derby Day crowds would have been essentially unmanaged at least up to the borders of Churchill Downs' private property. Metro could not have conceivably achieved its interests as effectively without permitting the safety and security plan's temporary measures." (Order, RE-101, PageID# 1331). However, any event plan did not include excluding non-ticket holders. The evidence is unanimous that, in the arrest area, no one was checking for tickets. Crowds came into the area unhindered, which defeated the purpose of any purported "safety and security plan." To the extent there was an "event plan," it was not the one Metro now asserts in this litigation.

Metro clearly had little to no interest in excluding non-ticketholders from the arrest area, as it took no measures to do so. Giving Churchill Downs complete control over public property, allowing them to remove anyone for any reason, in violation of their own permit, burdened substantially more speech than necessary, and was not narrowly tailored to serve any government interest.

### 5. The Restriction On Blankenship's Speech Did Not Leave Open Ample Alternative Channels Of Communication

Further, Metro and Young did not leave open ample alternative channels of communication. The Commonwealth in *McCullen* attempted to justify its buffer zones by arguing that protestors could still protest outside the buffer zones. The Supreme Court was not persuaded, noting that the plaintiffs gave evidence that their

conversations with women outside the clinics "have been far less frequent and far less successful since the buffer zones were instituted." 134 S. Ct. at 2436-37. A specific place where a message is communicated may be just as important as the message itself. *See City of Ladue*, 512 U.S. at 56. Thus, "a location across the street is not an ample alternative channel of communication when [a person] could have been standing in the park." *World Wide Street Preachers' Fellowship v. Reed*, 430 F. Supp. 2d 411, 415 (M.D. Pa. 2006). In other words, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939); *see also McCurry v. Tesch*, 738 F.2d 271, 275 (8th Cir. 1984) (same).

Here, Blankenship was not even given the option to move, but simply was arrested and removed from the area. He had no further opportunity to speak at all. Even had he been given the choice to move outside the signed area, he would only have been able to reach a smaller number of people. Moving farther away from his intended audience would defeat the whole purpose of bringing his message to the event. As the Supreme Court found in *McCullen*, this is not an ample alternative channel of communication.

Forcing citizens who wish to exercise their free speech and free exercise rights to leave Metro's public streets and sidewalks whenever there happens to be a special event nearby does not survive constitutional scrutiny. On the other hand, it clearly damages Blankenship's ability to engage in constitutionally-protected activities.

Under Metro's authority, Young arrested Blankenship for exercising his constitutional rights in a public forum, completely shutting down his ability to share his message. Further, Blankenship has not returned to the Kentucky Derby for fear of arrest, based on the fact that he was arrested in 2022. (Blankenship Dec., RE-59-1, PageID# 857). In this way, Metro and Young have successfully chilled Blankenship's core religious speech. This constitutes a clear violation of the First Amendment.

### 6.    Metro's Code And Policy Grant Unbridled Discretion

"A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County*, 505 U.S. at 130 (quoting *Heffron v. Int'l Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)). Here, Metro's Code and Policy allow for arbitrary application, as demonstrated by Metro's and Young's conduct towards Blankenship. Metro has implemented a Policy whereby it conveys unrestricted control over public property to a private entity by virtue of granting a non-exclusive permit.

Time, place, and manner restrictions quickly become unreasonable when the government attempts to regulate speech without first implementing traditional safeguards to protect against undue discretion and lack of clarity. *Saia v. People of*

*State of New York*, 334 U.S. 558, 562 (1948). The Supreme Court has consistently ruled that any law is unconstitutional which allows discretion in enforcement. *Kolender v. Lawson*, 461 U.S. 566, 575 (1974) (holding that all laws must provide "minimum guidelines to govern law enforcement" to prevent the possibility of discretionary enforcement). The Court in *American Jewish Congress v. City of Beverly Hills*, 90 F.3d 379, 385 (9th Cir. 1996) (*en banc*), held:

> [A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official. . . . [W]e have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.

*Id.* (citing *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763-64 (1988)).

Here, Metro's permitting scheme grants unbridled discretion to permittees. Metro does not distinguish between exclusive and non-exclusive permits. The permit granted to Churchill Downs is silent as to whether the permittee may require tickets to enter any or all sections of the permitted area. Neither the Code nor Metro's Policy provide any standards to govern the exercise of discretion over the permitted area. Sweeney, Metro's Rule 30(b)(6) witness, testified that, by virtue of obtaining Metro's permit, Churchill Downs controls the permitted property, and can operate

as if it were their property. (Metro Depo., RE-59-3, PageID# 867). It is treated "like their private property." (*Id.* at 875). Sweeney stated that Churchill Downs could have placed the "No Trespassing" sign farther away if it so chose, and that "[i]t was an arbitrary point at their discretion." (*Id.* at 868-69; *see also* 873). He went so far as to testify that excluding people selectively, while it would be unlawful, would not necessarily violate the permit. (*Id.* at 869).

In fact, Churchill Downs placed the "No Trespassing" sign at an area that was not, according to its own permit application, a ticketed area. They directed law enforcement to criminally trespass Blankenship in that non-ticketed area. Further, they did not check for tickets, and had no way of knowing if any non-ticketed person entered the so-called ticketed area. The sign itself did not state that a ticket was required, referencing only "credentials," which Ball testified were different from tickets. Churchill Downs applied the restriction selectively, as Ball testified that, if he saw someone enter the permitted area on their way to Wagner's Pharmacy, he would not check them for a ticket. Estephane had preached in the same area the day before with no ticket. All of this was allowed by Metro's vague Policy, which provided no guidance for its enforcement. Metro's Code and Policy cannot be a valid time, place, and manner restriction.

**7.    The Restriction On Blankenship's Speech Was Not Reasonable Or Viewpoint Neutral**

Even if this Court holds that the arrest area was a limited public forum, the restriction on Blankenship's speech was not reasonable or viewpoint neutral. In a limited public forum, the government "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint . . . ." *Rosenberger*, 515 U.S. at 829 (internal citations omitted) (quoting *Cornelius*, 473 U.S. at 804-06; citing *Perry*, 460 U.S. at 46, 49; *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U.S. 384, 392-93 (1993); *R.A.V.*, 505 U.S. at 386-88, 391-93).

As set forth above, Blankenship was removed based on the content of his speech. This was not simply an exclusion of all religious speech. Blankenship specifically was removed because Churchill Downs did not want him there. This can only be interpreted as viewpoint specific. This removal was authorized by Metro's permit and cession of all authority over the public street and sidewalk to Churchill Downs. Even if the removal of Blankenship was viewpoint-neutral, the abdication of government authority and responsibility was not reasonable in light of the purpose served by the forum. The area served as a walkway to the racetrack where the ticketed event took place. While it may be argued that there needed to be some control over the area in the interests of security and logistics, there is no conceivable reason why these interests could only be served by completely ceding all control

over the area to Churchill Downs. There certainly is no conceivable reason to allow Churchill Downs complete control over access, with the right to exclude anyone for any reason, including discriminatory reasons. (*See* Metro Depo., RE-59-3, PageID# 869).

Any argument that such control was somehow necessary is further belied by the fact that no control over the area was implemented. There was no checkpoint of any kind, no security, and no one checking tickets. The public was entering freely and unhindered. (*See* Video, RE-55-6, PageID# 505). Metro's grant of complete, unfettered, and unmonitored control over public streets and sidewalks to a private entity, and the resultant removal of Blankenship for the sole reason that Churchill Downs did not want him there, was unreasonable, and does not satisfy constitutional scrutiny even if it was viewpoint neutral.

**B.     Metro Is Liable Under *Monell* For The Constitutional Violations**

Under *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), "'a plaintiff may hold a municipality responsible for a "policy or custom" that inflicts a constitutional injury.'" *Stucker v. Louisville Metro Gov't*, 2024 U.S. App. LEXIS 11731, at *9 (6th Cir. May 13, 2024) (quoting *Monell*, 436 U.S. at 694). A plaintiff may succeed on a *Monell* claim even if there is no claim against the offending officer, as long as there is a constitutional violation. *Id.* at *11.

The arrest and removal of Blankenship was authorized by Metro pursuant to

its permitting scheme. This permitting scheme, enforced pursuant to Metro's Code, constitutes a Policy whereby Metro cedes control over public property to private entities by granting them a permit. There is no dispute that Central Avenue is a public street, and that Churchill Downs cannot own public property. Yet, on May 7, 2022, Churchill Downs exercised complete control over Central Avenue, including between 3rd and 4th Streets where Blankenship was arrested. No private entity can exercise control over public property unless so authorized by the government owner of the property. Logically, Churchill Downs could not have acted to have Blankenship arrested without the authority granted to it by Metro's Code and Policy.

The permit Metro granted to Churchill Downs was *non-exclusive*. The Permit itself nowhere mentions exclusive use or the right to require tickets. The well-established legal standard clearly states a permittee is allowed to limit access to permitted public property only when the permit is an exclusive-use permit. *See Parks v. City of Columbus*, 395 F.3d at 653; *Parks v. Finan*, 385 F.3d at 704-05; *McGlone v. Metro. Gov't of Nashville and Davidson Co.*, No. 17-6291, at *8.

Metro does not grant exclusive-use permits. (*See* Metro Depo., RE-59-3, PageID# 877). Yet, Metro not only allowed Churchill Downs to exclude non-ticketed individuals from the permitted area; it allowed them to do so with unbridled discretion. Metro's witness testified that, under Churchill Downs's permit, the permitted area is treated "like their private property." (*Id.* at 875). He testified that

excluding people selectively would violate the law "but not necessarily the permit." (*Id.* at 869). Any violation of the law would have to be addressed by law enforcement. (*Id.* at 869-70). Thus, Metro's permitting scheme fosters unbridled, unlawful discrimination.

In *McMahon*, 180 F. Supp. 3d at 1106, the Court held: "The City's stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling." Similarly, the arrest area was not ticketed. Metro simply gave "unquestioning deference to the whims of" Churchill Downs, simply because Metro had issued a permit. This deference included unconstitutional, selective exclusion of individuals from the permitted area.

Further, Metro granted to Churchill Downs authority in excess of what was sought by their permit application. In its application, Churchill Downs set forth that the area on Central Avenue from 9th Street, on the west, to 4th Street, on the east, would be ticketed.[4] Yet, Metro's representative testified that Churchill Downs could have placed the sign farther away if they so chose, and that "[i]t was an arbitrary point at their discretion." (Metro Depo., RE-59-3, PageID# 868-69; *see also* 873). In fact, Churchill Downs placed the "No Trespassing" sign on Central Avenue on

---

[4] This, again, is despite the fact that Churchill Downs was not applying for, and was not granted, an exclusive-use permit.

Third Street, one block beyond the "ticketed" area. As expressed by Metro's own witness, Metro granted Churchill Downs the authority to place the sign anywhere it wanted, consistent with the permitting scheme pursuant to which Metro ceded all control of the area to Churchill Downs to treat as its own private property.

In addition, Ball testified that the very language of the "No Trespassing" sign, which purported to express the policy that only people with proper "credentials" could enter the area, was drafted by the Louisville Metro Police Department. Metro not only issued a permit pursuant to its Code to foster unlawful censorship of free speech; Metro actually **participated** by drafting the language of the sign that marked the supposed "ticketed" area. Clearly, Metro cannot wash its hands of the unconstitutional exclusion of Blankenship from public property.

In addition, Ball testified that Metro was involved in creating the policy that established the ticketed area on Central Avenue. (Churchill Downs Depo, RE-58-2, PageID# 784). Specifically, representatives from Emergency Services and Metro Police were involved. (*Id.*). Further, Metro Police was the primary law enforcement agency on the scene. (*Id.* at 794, 796). Metro Police Chief Shields was involved in the planning process for security at the Derby. (*Id.* at 796). Metro Police, Special Events, and EMS were involved in creating a comprehensive plan for security related to the Derby. (*Id.* at 795-796; Interagency Public Safety Committee Kickoff, RE-58-3, PageID# 825-827).

It is well-settled precedent that Metro is not at liberty to alter the forum status on a temporary basis. Traditional public fora "are open for expressive activity regardless of the government's intent." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). Absent the grant of an exclusive permit, which Metro undisputedly did not grant, Metro could not allow the temporary closure of a traditional public forum by Churchill Downs by the grant of a permit. The record undisputedly reveals the area covered by Churchill Downs's non-exclusive permit, including the arrest area (which was not even part of Churchill Downs's purported "ticketed" area), was a traditional public forum, notwithstanding the permit. Metro cannot wash its hands of the matter and claim that the discrimination was directed by Churchill Downs. Metro's Code and Policy provided Churchill Downs the authority necessary to exclude individuals; allowed them to do so selectively; and drafted the language for the sign.

Metro, pursuant to its Code and Policy, ceded complete control over the public streets and sidewalks outside Churchill Downs by virtue of a City permit. But for Metro's permit, Young would have had no basis to arrest Blankenship for trespass. This complete abdication of authority over public property violated Blankenship's constitutional rights, and those of others similarly situated, and the violation of those rights was the obvious, predictable outcome of this abdication of authority. Metro is liable under *Monell* for the constitutional violations set forth herein.

## V. METRO AND YOUNG VIOLATED BLANKENSHIP'S DUE PROCESS RIGHTS

"'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'" *McGlone v. Cheek*, 534 Fed. Appx. 293, 297 (6th Cir. Aug 02, 2013) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). The *Cheek* Court quoted *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007):

> We have recognized that the vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]. With respect to the first goal, the Supreme Court has stated that "[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925). With respect to the second goal, the Supreme Court stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

*Id.* at 6-7. This "principle of clarity is especially demanding when First Amendment freedoms are at risk." *Id.* at 7 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).

Here, as set forth more fully above, Metro's Policy is vague, and allows for unbridled discretion in enforcement. The permit itself was vague and, together with Metro's laissez-faire treatment of the permit, led to Churchill Downs treating public streets and sidewalks like their own private property, and excluding whomever they

wished based on a non-existent ticketing requirement. This unbridled discretion resulted in the violation of Blankenship's First Amendment rights. Accordingly, Metro and Young violated Blankenship's Due Process rights under the Fourteenth Amendment.

## VI.    <u>YOUNG IS NOT ENTITLED TO QUALIFIED IMMUNITY</u>

The District Court found that Young was entitled to qualified immunity because (1) there was no constitutional violation, and (2) he had probable cause to arrest. (Order, RE-101, PageID# 1336-37). As set forth above, Young violated Blankenship's constitutional rights. Second, the Court only found qualified immunity as to Blankenship's false arrest claim. (Opinion & Order, RE-30, PageID# 165). More importantly, qualified immunity only applies to claims for damages – not for claims for declaratory or injunctive relief. *See Bethel v. Shoop*, 2024 U.S. App. LEXIS 13191, at *11 (6th Cir., May 30, 2024) (quoting *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 417-18 (6th Cir. 2019) (quoting *Williams v. Kentucky*, 24 F.3d 1526, 1541 (6th Cir. 1994))). Thus, if there was a constitutional violation, it does not matter, for purposes of Blankenship's claims for declaratory and injunctive relief, whether the law was "clearly established."

The District Court held that "Young's [probable cause] argument speaks directly to [the second] prong by arguing that he acted pursuant to the permitting scheme which was validly enacted under Metro's code." (Opinion & Order, RE-30,

PageID# 168). Because qualified immunity does not apply to Blankenship's claims for declaratory and injunctive relief, the existence of probable cause cannot absolve Young of liability because Prong II of the qualified immunity analysis does not apply to those claims.

## CONCLUSION

For the foregoing reasons, the District Court erred by granting Metro's and Young's Motions for Summary Judgment and denying Blankenship's Motion for Summary Judgment. Accordingly, this Court should reverse the granting of Metro's and Young's summary judgment, enter summary judgment for Blankenship, and grant any further relief that is equitable and just.

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
E-mail: david@pabilaw.org

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1):

• this document contains 12,964 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

• this document has been prepared in a proportionally-spaced typeface using Word 2016 in 14-point Times New Roman font.

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 2, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org

# ADDENDUM

1.     RE-1, **Plaintiff's Complaint**, PageID Range 1-27

2.     RE-52, **Metro Government's Motion for Summary Judgment**, PageID Range 239-240

3.     RE-55, **Defendants' [Elliott Young's] Motion for Summary Judgment**, PageID Range 341-342

4.     RE-55-2, **Deposition of Elliott Young**, PageID Range 358-471

5.     RE-55-6, **Notice of Conventional Filing of Defendant's Video Exhibit ("Full Preach May 7 Kentucky" video)**, PageID Range 505

6.     RE-58, **Plaintiff's Motion for Summary Judgment**, PageID Range 717-748

7.     RE-58-1, **Permit Application**, PageID Range 749-779

8.     RE-58-2, **Deposition of Josh Ball as Rule 30(b)(6) witness of Churchill Downs**, PageID Range 780-799

9.     RE-58-3, **Interagency Public Safety Committee Kickoff**, PageID Range 825-827

10.    RE-58-4, **Deposition of Josh Ball**, PageID Range 841-852

11.    RE-59-1, **Declaration of Jacob Blankenship**, PageID Range 855-857

12.    RE-59-2, **Louisville-Jefferson County Metro Government, Kentucky Code of Ordinances**, PageID Range 858-862

13.    RE-59-3, **Deposition of Doug Sweeney as Rule 30(b)(6) witness for Louisville-Jefferson County Metro Government**, PageID Range 863-877

14.    RE-59-4, **Event Permit**, PageID Range 878-880

15.    RE-59-5, **Photograph of No Trespassing Sign**, PageID Range 881-882

16.    RE-59-6, **Uniform Citation**, PageID Range 883-884

17.  RE-59-7, **Deposition of Matt Johnson**, PageID Range 885-897

18.  RE-59-9, **Deposition of Jeremy Smith**, PageID Range 913-926

19.  RE-59-10, **Declaration of Joseph Estephane**, PageID Range 927-931

20.  RE-74, **Metro Government's Response**, PageID Range 1115-1129

21.  RE-101, **Memorandum Opinion & Order**, PageID Range 1316-1339

22.  RE-102, **Judgment**, PageID Range 1340

23.  RE-103, **Notice of Appeal**, PageID Range 1341-1343