No. 25-5014

UNITED STATES COURT OF APPEALS
for the SIXTH CIRCUIT

JACOB GLENN BLANKENSHIP, AS AN INDIVIDUAL

*Plaintiff-Appellant,*

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT,
ELLIOTT YOUNG, IN HIS INDIVIDUAL CAPACITY AND ACTING AS
A TROOPER/OFFICER FOR KENTUCKY STATE POLICE

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Western District of Kentucky in Case No. 3:23-cv-00235

**BRIEF OF APPELLEE LOUISVILLE-JEFFERSON COUNTY,
KENTUCKY METRO GOVERNMENT**

Bruce B. Paul
William G. Carroll
**McBrayer PLLC**
500 West Jefferson Street, Suite 2400
Louisville, Kentucky 40202
(502) 327-5400
bpaul@mcbrayerfirm.com
wcarroll@mcbrayerfirm.com
*Counsel for Appellee, Louisville-Jefferson County, Kentucky Metro Government*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-5014          Case Name: Blankenship v. Louisville-Jefferson Cou

Name of counsel: Bruce B. Paul

Pursuant to 6th Cir. R. 26.1, Louisville-Jefferson County, Kentucky Metro Government
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ July 2, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Bruce B. Paul
McBrayer PLLC
500 W. Jefferson, 2400, Louisville, KY

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND
FINANCIAL INTEREST ..................................................................................i

TABLE OF CONTENTS..................................................................................ii

TABLE OF AUTHORITIES ...........................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE.........................................................................2

    A. Churchill Downs' Special Event Permit ......................................................2

    B. The 2022 Kentucky Derby and the No Trespassing Signs ........................4

    C. Blankenship's Trespass and Arrest ...........................................................7

    D. Lawsuit and Procedural History...............................................................11

SUMMARY OF THE ARGUMENT ..................................................................12

ARGUMENT ...............................................................................................15

    I. Standard of Review .................................................................................15

    II. The District Court's Memorandum Opinion & Order [RE 101] denying
    Blankenship's Motion for Summary Judgment and granting Metro and
    Young's separate Motions for Summary Judgment should be
    affirmed ....................................................................................................16

        A. Free Speech Claim............................................................................16

i. The nature of the forum is not relevant when the restriction on speech is content neutral ...........................................................18

ii. The restriction on Blankenship's speech was content neutral and, therefore, the District Court was correct when it applied intermediate scrutiny.................................................................21

iii. The restriction at issue survives intermediate scrutiny.............31

a. The restriction served a significant governmental interest..32

b. The restriction was narrowly tailored ..................................35

c. Blankenship was offered alternative channels of communication....................................................................37

B. Free Exercise Claim ...........................................................................40

C. Due Process Claim ............................................................................41

III. Metro was entitled to summary judgment because Blankenship failed to establish that an unconstitutional custom, policy, or practice violated his rights ..........................................................................................................42

CONCLUSION ....................................................................................................46

CERTIFICATE OF COMPLIANCE .....................................................................47

CERTIFICATE OF SERVICE ..............................................................................47

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............48

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)...................................15

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020)..........................18

*Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397 (1997)..............46

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................15

*Chambers v. Sanders*, 63 F.4th 1092 (6th Cir. 2023) ..............................................44

*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. Of the L. v. Martinez*, 561 U.S. 661 (2010) ...................................................................22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520 (1993) .......41

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)............................17

*Employers Insurance of WAUSAU v. Petroleum Specialties, Inc.*, 69 F.3d 95 (6th Cir. 1995) ......................................................................................16

*Franklin v. Kellogg Co.*, 619 F.3d 604 (6th Cir. 2010) ..........................................15

*Hartman v. Thompson*, 931 F.3d 471 (6th Cir. 2019) .............................................17

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981)...........16

*Hill v. Colorado*, 530 U.S. 703 (2000) .............................................................21, 24

*McCullen v. Coakley*, 573 U.S. 464 (2014)............................................................24

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477 (6th Cir. 2020) ...................................................................................41

*Monell v. Dep't of Social Servs.,* 436 U.S. 658 (1978) .....................................43, 46

*Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005) ................................ 25-27

*Peffer v. Stephens*, 880 F.3d 256 (6th Cir. 2018) ....................................................15

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ...... 18, 26-27

*Phelps–Roper v. Strickland*, 539 F.3d 356 (6th Cir.2008) ......................................19

*Reform Am. v. City of Detroit, Michigan*,
37 F.4th 1138 (6th Cir. 2022) ....................................................22-23, 31-33, 35-38

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) ................18-19, 21, 33-35

*Spingola v. Village of Granville,* 39 F. App'x 978 (6th Cir. 2002)................... 19-20

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ........................43, 46

*TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct. 57, 67 (2025) ........................18, 22

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ......................22, 24, 31, 35, 38

*West v. Kentucky Horse Racing Comm'n*, 975 F.3d 881 (6th Cir. 2020)................42

*Williams v. Ford Motor Co.*, 187 F.3d 533 (6th Cir. 1999) ....................................16

## STATUTES

42 U.S.C. § 1983 ...............................................................1, 11, 14, 16, 43

## RULES

Fed. R. Civ. P. 56(a)........................................................................ 15-16

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Appellee, Louisville-Jefferson County, Kentucky Metro Government ("Metro"), does not request an oral argument. This matter may be resolved by the Court on the basis of the briefs and the record alone.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1. Whether the District Court was correct in denying Blankenship's motion for summary judgment while granting Metro and Trooper Elliot Young's separate motions for summary judgment, particularly as to the following claims:

    a. Blankenship's First Amendment Free Speech Claim arising under 42 U.S.C. § 1983. [RE 101 at PageID# 1332.]

    b. Blankenship's First Amendment Free Exercise Claim arising under 42 U.S.C. § 1983. [RE 101 at PageID# 1333.]

    c. Blankenship's Fourteenth Amendment Due Process Claim arising under 42 U.S.C. § 1983. [RE 101 at PageID# 1335.]

    d. Blankenship's *Monell* municipal liability claim. [RE 101 at PageID# 1335-36.]

2. Whether Metro was entitled to summary judgment because Blankenship failed to establish that said alleged unconstitutional custom, policy, or practice of Metro caused a violation of one or more of his rights.

## STATEMENT OF THE CASE

### A.    Churchill Downs' Special Event Permit

In 2022, Churchill Downs Racetrack, LLC ("Churchill Downs") submitted a "Special Event Permit Application" to Metro to restrict traffic on streets near Churchill Downs  and create restricted zones for "the 148th running of the Kentucky Derby and Kentucky Oaks, two of the most famous horse races in North America." [*See* RE 55-3 at PageID# 481.] The purpose of the application was "[t]o protect the venue and spectators attending the events at Churchill Downs" and planning "accounted for perimeter and event security, traffic control and access, and safety and medical in support of the Kentucky Oaks and Kentucky Derby 148." [*Id.* at Page ID# 487.] The application and plan were established in consultation with "an entire security and safety planning committee made up of multiple agencies." [Churchill Downs 30(b)(6) Dep. of Josh Ball ("Ball Dep.") at 15:3-22, RE 76-1, PageID# 1152.]

On or about April 29, 2022, Metro approved Churchill Downs' application and issued the applied-for Event Permit. [Event Permit, RE 52-2, PageID# 266-67.] The Event Permit, described as "Kentucky Oaks and Kentucky Derby Security and Traffic Control Plan," provided for "restricted access" on "Central Ave. from Taylor Blvd. to Floyd St." from May 4 to May 7, 2022. [*Id.*; *see also* Google Maps screen capture of Third St. and Central Ave., RE 52-2, PageID# 265.] The Event Permit also closed Central Ave. from Taylor Blvd. to Floyd St. during the same timeframe.

[Event Permit, RE 52-2, PageID# 267.] The Event Permit specifically stated that "only authorized vehicles will have access to Central Avenue." [*Id.*] Doug Sweeney, special events manager for Metro, testified:

> [Churchill Downs was] controlling Central Avenue all the way from the northern sidewalk over to the southern side, starting at Taylor Boulevard and continuing all the way down to Floyd Street. And then off of Floyd Street they controlled Fourth Street from Haywood down to where it became Oakdale. And then from Oakdale down to where it merged with Southern Parkway at Third Street.

[30(b)(6) Dep. of Doug Sweeney ("Sweeney Dep.") at 34:15-34:22, RE 59-3, PageID# 868.] Mr. Sweeney clarified the scope of the Event Permit during his deposition:

> Q. Well, what authority specifically does the permit give to Churchill Downs to exclude people from their permitted area?
>
> A. The permit gives them the right to conduct their operations within the area they control. They -- if they decide they want to set up a point that says right here you have to -- have to have a ticket to get by, or we have the right to review your ticket, either every person or randomly, they do have that -- within that -- that location on that area, even though it's a public property, they control it and they can decide at which point they want to review tickets or sell tickets or allow people to walk through.
>
> . . .
>
> Q. And is their authority to do -- to do that, to put up the sign or to require tickets, is that granted by the permit?
>
> A. Not expressly. But they do control it, and they—if that's how they want to operate within the part they control, it's—it's just—at that point, it's as if they're at—it is their property. There's nothing within the permit that says, hey, you can put up any signs you

3

want anywhere. But it says you control this area, and you can operate legally and lawfully within that area as if it were your property.

[*Id.* at PageID# 867.] Notably, however, Mr. Sweeney also testified that Churchill Downs had control over the property to the extent it complied with the law:

> Q.  In other words, outside of established law, does the permit granted by Metro provide any other restrictions on—or limits on Churchill Downs' ability to control their permitted area?
>
> A.  *They cannot do anything that is outside of established law. They have to operate within the boundaries of what is—is established law at that time. And the permit gives them no authority to do anything beyond that.*

[*Id.* at Page ID# 873 (emphasis added).]

**B.  The 2022 Kentucky Derby and the No Trespassing Signs**

On May 7, 2022, the Kentucky Derby took place at Churchill Downs. Churchill Downs placed two "No Trespassing" signs on Central Avenue at Third Street that read:

NO TRESPASSING

VALID CREDENTIALS ONLY
BEYOND THIS POINT

CONSENT TO SEARCH OF
PROPERTY OR PERSON
BEFORE ENTERING

["No Trespassing Sign," RE 52-5, PageID# 287; *see also* Google Maps screen capture of Third St. and Central Ave., RE 52-2, PageID# 265.] Churchill Downs

placed the signage within the "restricted access" area granted by the Event Permit. According to Mr. Sweeney, "VALID CREDENTIALS ONLY" referred to tickets: "[Churchill Downs] clearly put up a notice that you have to have valid credentials. That—generally that means tickets or other authority." [Sweeney Dep. at 33:08-09, RE 59-3, PageID# 867.] Josh Ball, head of Churchill Downs' security, testified that to legally walk beyond the "No Trespassing" sign, individuals would have needed "either valid credentials or a ticket":

> Q.    Okay. So, are you saying that they would also need tickets in order to get past this sign if it was members of the public?
>
> A.    Members of the public, yes.
>
> Q.    Okay. And do you know if there was anyone checking for tickets at this point?
>
> A.    I do not.
>
> Q.    Okay. So, if someone beyond this sign in this area that does not have either valid credentials or a ticket to the Kentucky Derby if this is Saturday, would those people be unauthorized in this area?
>
> A.    Yes.

[Ball Dep. at 20:3-14, RE 76-1, PageID# 1153.] Major Matt Johnson, Kentucky State Police's commanding officer for the event, testified that "valid credentials" meant individuals were authorized to be within the area:

> Q.    What does valid credentials mean?

A.    That you've got—that you're—you're allowed past that point. You've got—credentials could mean a lot of things, but essentially, it's you're authorized to go—to be within the area.

[Dep. of Major Matt Johnson ("Johnson Dep.") at 32:25-33:4, RE 55-7, PageID# 538-39.] KSP Trooper Elliot Young testified that valid credentials were "[a]nything deemed by Churchill Downs to be valid credentials." [Dep. of Trooper Elliot Young ("Young Dep.") at 33:15-16, RE-52-8 at PageID# 313.]

Regarding Churchill Downs' placement of the "No Trespassing" signs, Mr. Sweeney testified that Churchill Downs was free to set the no trespassing sign anywhere within the permitted area:

Q.    And then your testimony is there's some area outside the sign that's still covered by their permit?

A.    That is correct.

Q.    Is there any difference in the level of control Churchill Downs has over the area outside as opposed to the area inside?

A.    Only because they chose to do so. They could have had that sign a block further east if they wanted, so. Because they still could - - permitted that area. It was an arbitrary point at their discretion. I don't know what came into their decision to do that, *but the same authority to post the sign here and check credentials exists down at Floyd and Central if they wanted to.*

Q.    So as far as Metro is concerned in granting the permit, there –

A.    No difference to me. This is just—apparently happens to be where they decided they want to start checking credentials.

[*Id.* at 34:15-22, RE 59-3, PageID# 869.] Regardless of what the "Special Event Permit Application" requested, Churchill Downs was clearly permitted to set up a restricted zone anywhere within the geographic boundaries provided by the Event Permit.

### C. Blankenship's Trespass and Arrest

On May 7, 2022, the day of the Kentucky Derby, Blankenship and a group of preachers gathered in a parking lot near Churchill Downs. Blankenship recorded the entire series of events from his group's initial gathering in the parking lot through his arrest. This recording was filed in the District Court record on September 3, 2024. [*See* Full Preach May 7 Kentucky Video, RE 62.] After meeting in the parking lot, Blankenship and his group gathered their signs, flags, megaphones, cameras, and other equipment and began walking towards Churchill Downs to preach. [*Id.* at 12:18:30.]

Blankenship and his group did not have tickets. As Blankenship and the group made their way towards Churchill Downs, they crossed Third Street and continued beyond the "NO TRESPASSING" signs. [*Id.* at 12:51:20; No Trespassing Sign, RE 52-5, PageID# 287.] The "NO TRESPASSING" signs were placed on gates that restricted and narrowed the span of pedestrian traffic for controlling egress and ingress. [Full Preach May 7 Kentucky Video, RE 62 at 12:51:20.] Fencing lined the sidewalk from the gates towards Churchill Downs, which created the permitted area.

[*Id.*] Blankenship's group stopped approximately halfway between Third and Fourth Streets, set up, and continued to engage with and preach at people heading towards Churchill Downs. [*Id.* at 12:52:10]. Again, Blankenship and his group had no tickets, yet set up in an area past the "NO TRESPASSING" signs approximately a half block into the restricted area. [*See id.* at 12:51:20; No Trespassing Sign, RE 52-5, PageID# 287.]

Approximately eighteen minutes after Blankenship and his group set up in the restricted zone, they were approached by a uniformed Churchill Downs security guard. [Full Preach May 7 Kentucky Video, RE 62 at 13:08:30.] The security guard began speaking with Joseph Estephane, one of the preachers, and stated, "ya'll gotta go, you're trespassing right now." [*Id.* at 13:08:35.] A second uniformed security guard approached as the first security guard continued speaking with Mr. Estephane. [*Id.* at 13:09:08.] Blankenship thereafter interjected and stated to Mr. Estephane, "hey, hey don't even argue with them, they're security guards." [*Id.* at 13:09:33.] A second preacher from Blankenship's group joined the conversation. At one point, the second security guard stated, "you can go on the other side all you want," indicating that Blankenship and his group were free to move outside the restricted zone and continue preaching. [*Id.* at 13:10:35.] The area outside the restricted zone was only a half-block away. The security guards then exited the conversation, backed away, and continued observing from a distance. [*Id.* at 13:10:50.]

Shortly after the interaction with the security guards, Blankenship had the following conversation with Mr. Estphanae:

| | |
|---|---|
| Estaphane: | They're saying we're trespassing. |
| Blankenship: | [gesturing] On their property, but this is a sidewalk, a right of way, so we don't have to listen to them. Don't, don't listen to them. Don't even entertain them, they're not cops. |
| . . . | |
| Estaphane: | Yesterday I had state troopers threaten me with trespassing. |
| Blankenship: | I'll talk to them when they get here. |

[*Id.* at 13:11:26-13:11:44.] Blankenship apparently chose to ignore the Churchill Downs staff's simple request to leave the restricted area because "they're not cops."

Approximately an hour after Blankenship and his group were asked to move by Churchill Downs' uniformed security, the Kentucky State Police ("KSP") arrived. [*Id.* at 14:13:40.] KSP troopers congregated near Blankenship's group and observed Blankenship while he was preaching. Around this time, Blankenship was warned again by Josh Ball, Director of Security for Churchill Downs, that he could not be there without a ticket. [*See* Dep. of Capt. Jeremy Smith ("Smith Dep.") at 9:11-20, RE 71-1, PageID# 1009.] In fact, Capt. Smith, who was among the KSP troopers congregating near Blankenship, "physically saw Josh Ball walk down and talk to Blankenship and the other guys that were there." [*Id.*] Capt. Smith explained that Ball "met with us prior to making contact with [Blankenship], and addressed

9

concerns of his trespass, and Josh Ball actually went down and spoke with your client and other people that were there, and told them that they needed to leave the property, and that's not depicted in the video." [*Id.* at 9:2-7.]

After observing Blankenship's preaching for a short time, the KSP troopers approached Blankenship's group and detained Estaphane. [Full Preach May 7 Kentucky Video, RE 62 at 14:18:20.] Blankenship asked "what's going on?" to which a trooper responded "you're trespassing." [*Id.* at 14:18:25.] The trooper reiterated to Blankenship "you've been warned multiple times—you can leave—listen—you can leave, or you're gonna go like him—right now." [*Id.* at 14:18:33.] Blankenship agreed to leave but continued to argue with the troopers stating, "you guys don't know the law" and "I haven't been warned one time." [*Id.* at 14:18:40-14:19:16.] Blankenship was then arrested for trespassing by the KSP Trooper Young.

Relying on information from Churchill Downs and the signs requiring valid credentials, KSP reasonably believed that Blankenship was required to have a ticket to be in the restricted area. [Smith Dep. at 18:24-19:4, 34:15-35:8, RE 71-1, PageID# 1019, 1034-35; Johnson Dep. at 56:12-16, 59:8-13, 85:7-12, RE 55-7, PageID# 562, 565, 591; Young Dep. at 33:6-10, 35:1-3, 43:20-21, 49:3-4, RE 55-2, PageID# 391, 393, 401, 407.] Multiple KSP witnesses testified that Blankenship would not have been arrested if he was standing outside of the restricted area or if he had a ticket. [Johnson Dep. at 92:24-93:3, RE 55-7, PageID# 598-99; *see also* Young Dep. at

67:1-8, RE 55-2, PageID# 425.] Despite being asked to move by Churchill Downs' uniformed security, Blankenship repeated several times "nobody's asked me to leave one time." [Full Preach May 7 Kentucky Video, RE 62 at 14:19:20.] Although Blankenship and Estaphane were arrested, the other preachers in their group moved outside the restricted area and continued preaching. [Dep. of Jacob Blankenship at 73:23-74:10, RE 55-8 at PageID# 699.] Blankenship was charged for third degree criminal trespass with Appellee Trooper Young listed as the charging officer. [Kentucky Uniform Citation, RE 55-9, PageID# 711.] Blankenship's criminal trespassing charge was dismissed without prejudice, with the condition that he have no unlawful contact with Churchill Downs. [Docket Sheet, RE 55-10, PageID# 712.]

Blankenship testified that no Metro representatives were involved in his arrest or charges. [Blankenship Dep. at 47:18-49:6, RE 55-8 at PageID## 672-74.] Blankenship had no interactions with anyone from or associated with Metro, and no Metro communication lead to the arrest. [*Id.*] Louisville Metro Police Department's only involvement in the vicinity at the time was traffic control. [Sweeney Dep. at 29:18-24, 82:1-3, RE 55-2, PageID## 257, 264.]

### D. Lawsuit and Procedural History

On May 8, 2023, Blankenship brought suit against Metro and Trooper Young. [*See* Compl., RE 1.] Blankenship alleges claims arising under 42 U.S.C. § 1983. Specifically, Blankenship alleges that Metro and Trooper Young's conduct deprived

him of freedom of speech, freedom of exercise, and due process rights. [*See id.*] Blankenship also brought a false arrest claim against Trooper Young. [*See id.*] Blankenship sought injunctive, monetary, and declarative relief. [*See id.*]

On March 21, 2024, the District Court granted Trooper Young's Motion to Dismiss on Blankenship's official capacity claims. [*See* Memorandum Opinion & Order, RE 30.] Of note, the District Court dismissed Blankenship's official capacity claims because it found Trooper Young had probable cause to arrest Blankenship and was entitled to qualified immunity. [*Id.* at PageID# 173.]

On September 3, 2024, all three parties moved for summary judgment. [Metro's Mot. for Sum. J., RE 52; Trooper Young's Mot. for Sum. J., RE 55; Blankenship's Mot. for Sum. J., RE 58.] On December 6, 2024, the District Court entered a Memorandum Opinion & Order denying Blankenship's Motion for Summary Judgment and granting both Metro and Trooper Young's separate Motions for Summary Judgment. [Memorandum Opinion & Order, RE 101.] On January 2, 2025, Blankenship filed a Notice of Appeal to this Court seeking review of the District Court's Memorandum Opinion & Order.

## SUMMARY OF THE ARGUMENT

The District Court properly granted Metro's and Trooper Young's separate motions for summary judgment and denied Blankenship's motion for summary judgment.

Regarding Blankenship's Free Speech claim, the District Court correctly determined that the alleged restriction on Blankenship's speech was content neutral. [RE 101 at PageID# 1327; 1329.] Because the restriction was content neutral, the District Court correctly applied intermediate scrutiny. [*Id.* at PageID# 1330.] The District Court then determined that the restriction satisfied intermediate scrutiny because it (1) served significant government interests such as traffic management and public safety, (2) was likewise narrowly tailored because Metro would have achieved those interests less effectively absent the restricted area, and (3) Blankenship was offered sufficient alternative channels of communication. [*Id.* at PageID# 1330-32.] These findings are well-supported by both law and fact and should be affirmed.

As to Blankenship's Free Exercise claim, the District Court recognized that the ticketed area restricted Blankenship's preaching no differently than it restricted non-religious conduct, and that Blankenship was arrested for his lack of credentials, not his speech or expression of religion. [*Id.* at PageID# 1333.] The District Court reasoned that it was not unconstitutional to prohibit Blankenship from doing what nobody was permitted to do, *i.e.* trespass and linger in the ticketed area without proper credentials. [*Id.*] As such, because the ticketed area's restrictions only incidentally effected Blankenship's preaching, on his free exercise claim, the District Court reasoned that Metro and Young were entitled to judgment as matter of law.

[*Id.*] Again, the District Court's findings on Blankenship's Free Exercise claim are well supported and should be affirmed.

The District Court also determined that Blankenship's Due Process claim failed for two reasons. [*Id.* at PageID# 1334.] First, Blankenship failed to assert any property or liberty interest for his claim. [*Id.* at PageID# 1335.] Second, Blankenship was not subjected to the law he challenges. [*Id.*] Churchill Downs was the permit applicant and event holder, not Blankenship. [*Id.*] Metro's permitting scheme neither forbade nor required any action from Blankenship. [*Id.*] These findings are likewise well supported and should be affirmed by this Court.

Finally, to succeed in any § 1983 suit against a municipality, a plaintiff must show that there is a direct causal link between the policy and the alleged constitutional violation while showing that the illegal policy is the moving force behind the alleged violation. Here, the District Court did not address this argument because it found no underlying constitutional violation, therefore there was nothing to hold Metro liable for. [*Id.* at PageID# 1336.] However, even if there were a constitutional violation, Blankenship failed to establish that an unconstitutional custom, policy, or practice of Metro caused a violation of one or more of his rights. Therefore, Metro was entitled to summary judgment regardless of the existence of any alleged constitutional violation.

# ARGUMENT

## I.    Standard of Review

This matter is on appeal from the District Court's order granting Metro and Young's separate motions for summary judgment and denying Blankenship's motion for summary judgment. [RE 101.] The District Court's granting of summary judgment is subject to de novo review. *See Franklin v. Kellogg Co.*, 619 F.3d 604, 610 (6th Cir. 2010)

Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a fact to be material, it must affect the outcome of the suit; "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248. The moving party has the initial burden of showing that there is an absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The non-moving party, Blankenship here, must proffer evidence that points to disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

On a motion for summary judgment, "[t]he pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Employers Insurance of WAUSAU v. Petroleum Specialties, Inc.*, 69 F.3d 95, 102 (6th Cir. 1995) (intervening citation omitted). The party bearing the burden of proof must "present more than a scintilla of evidence in support of his position." *Id*. They must present "evidence on which the jury could reasonably find for the Plaintiff." *Id*. To successfully defeat a motion for summary judgment, the opposing party cannot merely rely "on allegations contained in their complaint or on affidavits that merely state conclusory allegations." *Williams v. Ford Motor Co.*, 187 F.3d 533, 544 (6th Cir. 1999) (citing to Fed. R. Civ. P. 56).

II.     **The District Court's Memorandum Opinion & Order [RE 101] denying Blankenship's Motion for Summary Judgment and granting Metro and Young's separate Motions for Summary Judgment should be affirmed.**

Blankenship alleged claims arising under 42 U.S.C. § 1983—specifically, Blankenship alleged Metro and Trooper Young's conduct deprived him of freedom of speech, freedom of exercise, and due process rights. [*See* Complaint, RE 1.]  The District Court's Memorandum Opinion & Order disposing of these claims should be affirmed for the reasons set forth below.

A.     **Free Speech Claim**

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *Heffron v. Int'l*

*Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The US Supreme Court has "often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.*

The District Court correctly determined that Blankenship's free speech claim "depends on three inquiries: (1) whether speech is protected; (2) 'the nature of the forum' in which the speech occurs; and (3) whether the government's restriction on speech satisfies the relevant forum's associated constitutional standard." [RE 101 at Page ID#1323] (citing *Hartman v. Thompson*, 931 F.3d 471, 478 (6th Cir. 2019)). There was no dispute that Blankenship's speech was constitutionally protected. [*See id.* at PageID# 1324.] The District Court dismissed the nature of the forum inquiry as irrelevant because it determined the restriction at issue was content neutral. [*Id.* at PageID## 1327; 1329.] On the third inquiry, because the restriction was content neutral, the District Court correctly applied intermediate scrutiny. [*Id.* at PageID# 1330.] The District Court then undertook a detailed analysis and determined that the restriction at issue satisfied intermediate scrutiny. [*Id.* at PageID## 1330-32.]

**i.    The nature of the forum is not relevant when the restriction on speech is content neutral.**

By spending much of his brief arguing that the District Court erred in determining the nature of the forum at issue [Brief of Appellant at 32-30], Blankenship ignores the District Court's correct statement of law that "if the restriction of Blankenship's speech was content-neutral, it makes no difference whether Blankenship was arrested in a traditional or limited public forum." [*Id.* at PageID#1327] (citing *Saieg v. City of Dearborn*, 641 F.3d 727, 734 (6th Cir. 2011)). Even if Young arrested Blankenship in a "traditional public forum" as Blankenship argues, the state may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618, (2020) ("[C]ontent-neutral laws are subject to a lower level of scrutiny."). "Content-neutral laws . . . are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct. 57, 67 (2025) (internal citations omitted).

The District Court relied on *Saieg v. City of Dearborn* in determining that the nature of the forum was not relevant to the analysis. In *Saieg*, this Court addressed

First Amendment claims against the City of Dearborn, Michigan. Appellant, George Saieg, and a group of Christians planned to attend the Arab International Festival in Dearborn to try and convert Muslims to Christianity. 641 F.3d 727 at 729. Dearborn police instituted a leafleting restriction for the festival that prevented distribution of leaflets "from the sidewalks that are directly adjacent to the Festival attractions, or on the sidewalks and roads that surround the Festival's core on each side by one to five city blocks." *Id.* at 729-30. The restriction limited leafleting to stationary booths. *Id.* at 730. Saieg and his group were provided with a booth but were not permitted to distribute leaflets outside of the booth. *Id.* at 732.

Saieg sued the City of Dearborn and police chief asserting violation of his First Amendment rights to free speech, free association, and free exercise of religion, in addition to violating the Equal Protection Clause. *Id.* Notably, and most relevant to this appeal, the parties disagreed "about whether the streets and sidewalks within the inner and outer perimeters were functioning as traditional public fora or limited public fora during the Festival." *Id.* at 734. This Court dismissed the distinction: "If a rule is 'content-neutral, [then] the appropriate test is intermediate scrutiny,' ***even when the rule governs speech in a traditional public forum***." *Id.* (citing *Phelps–Roper v. Strickland*, 539 F.3d 356, 361–62 (6th Cir.2008)) (emphasis added).

Similarly, in *Spingola v. Village of Granville*, this Court considered a First Amendment challenge to an ordinance providing "that during an assemblage for

which a permit has been issued the Village [of Granville] may designate a specific area for the purpose of public speaking and that public speaking shall be confined to the designated area." 39 F. App'x 978, 979 (6th Cir. 2002). Spingola, a preacher, characterized himself as a "confrontational evangelist" and applied for a public speaking permit for the Village of Granville's Fourth of July celebration. *Id.* The request was granted, and he appeared at the Fourth of July celebration and engaged in preaching at the designated location pursuant to the permit. *Id.* at 980. Spingola later challenged the ordinance. He argued strict scrutiny should apply because he sought "to preach on the 'public streets,' which have traditionally been one of the purest public forums entitled to 'strict scrutiny' of nay restrictions thereon." *Id.* at 982. The court recognized that "[t]he designated speaking area within the festival perimeter, though comprised of public streets, [was] not serving in that function during the festival." *Id.* at 983. However, the court noted that "regardless of whether we would classify the Granville festival area as a traditional public forum or a limited public forum, *as a content-neutral regulation, the Ordinance is examined under the same intermediate level of scrutiny.*" *Id.* (emphasis added).

This binding Sixth Circuit precedent dictates that the nature of the forum where Blankenship was arrested has no bearing on this case because the restriction on speech at issue was content neutral and therefore subject to intermediate scrutiny. Blankenship essentially concedes that content neutral restrictions are subject to

intermediate scrutiny but, instead, argues that the District Court erred in finding that the restriction on Blankenship's speech was content neutral. As set forth in detail below, the District Court properly found that the restriction on Blankenship's speech was content neutral.

> ii.     **The restriction on Blankenship's speech was content neutral and, therefore, the District Court was correct when it applied intermediate scrutiny.**

Regarding the appropriate constitutional standard, the District Court noted "while it is unclear whether Blankenship was arrested in a traditional or limited public forum, there is no question that the restrictions of his speech were content neutral." [RE 101 at PageID #1332.] The District Court correctly opined, "[i]n short, because the restrictions of access to the permitted and ticketed areas served purposes unrelated to the content of speech, those restrictions were content neutral. The purpose of establishing the permitted area—facilitating ingress and egress for Churchill Downs—can be justified without reference to the content of any speech." [*Id.* at PageID# 1329.]

"Whether a restriction on speech is content neutral has substantial bearing on the constitutionality of the restriction because 'the government is held to a very exacting and rarely satisfied standard when it disfavors the discussion of particular subjects or particular viewpoints within a given subject matter.'" *Saieg v. City of Dearborn*, 641 F.3d 727, 735 (6th Cir. 2011) (citing *Hill v. Colorado*, 530 U.S. 703,

735 (2000) (Souter, J., concurring)). However, content neutral laws and regulations are held to a lower level of scrutiny than content-based laws and regulations. *See TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct. 57, 67 (2025). "Government regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Id.* (citing *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 696 (2010)). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Here, the District Court held that the restriction of Blankenship's access to the permitted and ticketed areas served purposes unrelated to the content of expression and was therefore content neutral. [RE 101 at PageID# 1329.] The District Court found this case analogous to *Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138, 1143 (6th Cir. 2022). In *Reform Am.*, the city of Detroit, Michigan hosted the 2020 democratic presidential debate. 37 F.4th at 1143. The city created a "restricted area" accessible only by credential or ticket holders. *Id.* at 1144. Pedestrians did not have to undergo a security screening to enter the restricted area, but they could only enter if they held either media credentials or tickets for the debate. *Id.* Protestors were free to speak and handbill almost anywhere outside the restricted area. *Id.* A religious

group, Created Equal, arrived in downtown Detroit to protest the debate and attempted to enter the restricted area without tickets. *Id*. at 1145. They were advised they needed a ticket but ignored officers stating they had a First Amendment right to be there. *Id*. They were told that they were free to protest anywhere they wanted outside the restricted area or within designated free speech areas. *Id*. Created Equal eventually filed a lawsuit alleging First and Fourth Amendment violations stating the municipality's "official policy "was "the moving force of the constitutional violation." *Id*. at 1147.

There this Court upheld the city's policy restricting access that based solely on whether an individual had a ticket. *Id*. at 1152. Regarding the applicable constitutional standard, the court found that the policy at issue was content-neutral and therefore subject to intermediate scrutiny: "Because officers' sole criterion for admission to or exclusion from the restricted area—whether an individual had a ticket—was content neutral, defendants' incidental burden on plaintiffs' speech merits only intermediate scrutiny." *Id.* at 1149.

Here, just like *Reform Am.*, access to the restricted area where Blankenship was arrested was based solely on whether an individual had a ticket and not based on their conduct or content of any speech. It is undisputed that Blankenship did not have a ticket. Trooper Young, the arresting officer, testified that he did not arrest Blankenship for the content of his speech, but rather his lack of credentials:

Q. Okay. Well, in your answer here, you talk about abusive language, hostile environment, intent to humiliate and embarrass. If the message that he was sharing was not abusive, was not humiliating, and embarrassing, would he have been allowed to stay?

[Counsel's objection]

A. No, he would not have been allowed to stay based on the fact that he did not have the proper credentials to be there.

[Young Dep. at 81:2-11, RE 55-2, PageID# 439.] There is no evidence in the record that Blankenship was arrested for anything other than a lack of credentials. He was asked to leave the restricted area by Churchill Downs security, Josh Ball, and KSP, yet refused.

Importantly, "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014). Instead, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, ***even if it has an incidental effect on some speakers or messages but not others.***" *Id.* (citing *Ward*, 491 U.S. at 791) (emphasis added); *see also Hill*, 491 U.S. at 791. The District Court noted that "restricting the permitted area (including the ticketed area) for Kentucky Derby ingress and egress and no more than an incidental effect on where speech might occur." [RE 101 at PageID# 1329.] Simply because Blankenship's removal and arrest had an incidental effect on his speech does transform a content neutral restriction into a content-based restriction.

The District Court rejected Blankenship's argument that only preachers were told to leave. [RE 101 at PageID# 1328.] The District Court recognized that "[t]he permitted area was a thoroughfare" and that "KSP also ejected a ticketless group of dancers." [*Id.*] The court referenced KSP Major Matt Johnson's testimony and noted that "Churchill Downs did not check all individuals in the ticketed area for valid credentials, but neither did it allow anyone to linger there unnecessarily." [RE 101 at PageID# 1328.] Major Johnson confirmed that KSP removed other groups "that weren't allowed to be there based upon not having an—not having either credentials or a ticket for the event." [Johnson Dep. at 38:8-11, RE 55-7, PageID# 544.] He recalled a couple of incidents that year that occurred on both Friday and Saturday. [*Id.*] Major Johnson specifically confirmed that "there was another group within the fenced-in area, and they were told to—that they couldn't be here, that they had to move. And they complied and—and moved." [*Id.* at 39:24-40:2., RE 55-7, PageID# 555-56.] Simply stated, Blankenship and his cohort were not the only group to be move and the record reflects that the only criterion for exclusion was Blankenship's lack of credentials. There is no evidence that Blankenship was removed and arrested for the content of his speech.

Blankenship does not argue that the face of the Event Permit or the permitting scheme was content based. Rather, on appeal, Blankenship relies primarily on this court's opinion in *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), for the

argument that the only reasonable inference from the facts is that the restriction was content based. [*See* Blankenship's Brief at 34.] *Parks* is easily distinguishable from this case. In *Parks*, the City of Columbus, Ohio issued a permit for an arts festival on Civic Center Drive in downtown Columbus. 395 F.3d at 645. Notably, there were no ticketing requirements, and the permit stated the event was "free and open to the public." *Id.* Barricades were placed along Civic Center Drive to prevent cars from travelling down the road, but it was open to pedestrians and vendors. *Id.* On the day of the festival, Douglas Parks intended to proclaim and communicate his religious beliefs at the arts festival. *Id.* at 646. Mr. Parks passed the vehicle barricades while wearing a sign bearing a religious message. *Id.* A uniformed but off duty police officer stopped Mr. Parks, informed him that the sponsor of the event did not want him there, instructed him to move beyond the barricades, and warned that he would be arrested if he failed to comply. *Id.* Mr. Parks later sued the City of Columbus, the police chief, and the city attorney. *Id.*

On appeal, the Sixth Circuit determined that the Columbus arts festival was a traditional public forum. *Id.* at 652. The Court recognized that "[t]he state may only enforce a content-based exclusion if actions meet the strictest scrutiny, and therefore must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* at 653. (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). However, the Court *also*

recognized "that the state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* (citing *Perry*, 460 U.S. at 45).[1] The Court then analyzed whether the restriction on Parks' speech was content based or content neutral:

> During the Arts Festival, Parks was acting in a peaceful manner and the only difference between him and the other patrons was that he wore a sign communicating a religious message and distributed religious leaflets. When Officer Farr commanded Parks to move behind the barricaded area, he told Parks that the event sponsor did not want Parks there. The City offered no explanation as to why the sponsor wanted him removed. There is no evidence that the Arts Council had a blanket prohibition on the distribution of literature or that others engaging in similar constitutionally protected activity were removed from the permitted area. While the district court did not reach the question of whether the removal of Parks was based on the content of his speech, under these circumstances we find it difficult to conceive that Parks's removal was based on something other than the content of his speech.

*Id.* at 654. Ultimately, the Court inferred that Parks was asked to leave the premises due to the content of his speech because there was no other reasonable explanation for his exclusion. The arts festival was not a ticketed event, and it was clearly open to the public. There was no evidence that others were removed from the permitted area because of their constitutionally protected activity.

---

[1] *Parks* also supports Metro's argument that the nature of the forum is not relevant when the restriction on speech is content neutral.

Here, unlike *Parks*, Blankenship was arrested because he passed through a restricted area with clear signage indicating valid credentials were required. This was not a "free and open to the public" event like the art festival in Parks. Blankenship concedes this fact: "***While the Kentucky Derby itself is not free and open to the public***, the arrest area was not ticketed." [Blankenship Brief at 41 (emphasis added).] Ticket or no ticket, Blankenship was arrested within the restricted area provided by the Event Permit. As Doug Sweeney testified, the permit at issue provided Churchill Downs with authority to "conduct their operations within the area they control." [Sweeney Dep. at 34:15-34:22, RE 59-3, PageID# 868.] Pursuant to the permit, Churchill Downs placed two "No Trespassing" signs on Central Avenue and Third Street within the restricted area. Blankenship and his group walked past the "No Trespassing" signs and set up shop within the restricted area that was not "free and open to the public." Trooper Young testified that he arrested Blankenship for a lack of credentials, not the content of his message. [Young Dep. at 81:2-11, RE 55-2, PageID# 439.] Further, KSP Major Matt Johnson confirmed that other groups were also asked to leave the restricted area including a group of ticketless dancers. [Johnson Dep. at 39:24-40:2, RE 55-7, PageID# 555-56.] Blankenship was clearly arrested for trespassing due to a lack of credentials, a requirement that led to other groups of people to leave the restricted area.

Blankenship also argues, without support or citation to the record, that "Metro's censorship, instilled in the permitting process, empowers a permittee unbridled discretion to exclude disfavored people and speech from the confines of the permitted space." [Blankenship Brief at 33.] Yet Doug Sweeney, Louisville Metro's representative, testified that the permit did not authorize Churchill Downs to exclude people "indiscriminately" or "to do anything that's outside the scope of existing law":

> Q.     So if Churchill Downs had -- you mentioned indiscriminately. If Churchill Downs had for whatever reason decided to exclude someone from their permitted area. Let's say that they're not applying the rule equally, and they're excluding some people but not others from their permitted area. Does Metro have -- what's Metro's involvement, if any, in that? In Churchill Downs' authority to do that?
>
> A.     There's none. The -- the City does not off -- authorize -- that permit issued by the City does not authorize them to do anything that's outside of the scope of existing law. And they -- they have the right to put that fence where they want within their permitted area. But as far as exclusions of people or persons, long as it conforms with existing law, they're fine.

[Sweeney Dep. at 38:12-39:22, RE 59-3, PageID# 869.] Mr. Sweeney reiterated:

> Q.     So from Metro's perspective, is the area covered by the permit, is that treated as private property?
>
> A.     For -- in most -- most aspects, yes. ***But then they can still operate within -- they still have to operate within the law where particular law applies, but it's for their use.*** And so, if they said at point A, this is a -- you have to have tickets, and I went in there without a ticket, and they've -- this is the point where they've said you must be ticketed and credentialed, and I don't have them,

> then they can ask me to leave or -- and if I don't leave, I can be
> charged with criminal trespass.

[*Id.* at PageID# 872 (emphasis added).] Again, Mr. Sweeney testified,

> Q.    In other words, outside of established law, does the permit
>       granted by Metro provide any other restrictions on -- or limits on
>       Churchill Downs' ability to control their permitted area?
>
> A.    They cannot do anything that is outside of established law. They
>       have to operate within the boundaries of what is -- is established
>       law at that time. And the permit gives them no authority to do
>       anything beyond that.

[*Id.* at Page ID# 873.] The Event Permit at issue did not grant Churchill Downs

"unbridled discretion to exclude disfavored people and speech from the confines of

the permitted space." Instead, as Mr. Sweeney described, the Event Permit permitted

only legal exclusions such as trespassing due to lack of credentials.

Blankenship also states, without support, that "Metro enforced Churchill

Downs's wishes to exclude Blankenship, arresting him for trespass, simply because

Churchill Downs did not want him there." [Blankenship's Brief at 33.] Yet

Blankenship concedes that Churchill Downs directed KSP, *not Metro*, to arrest

Blankenship. [*Id.* at 41 ("Churchill Downs then had Blankenship arrested and

removed, calling him 'unauthorized. . .'"); *id.* at 5 ("Young arrested Blankenship for

criminal trespass."). Further, there is no evidence that Churchill Downs directed KSP

to exclude Blankenship because of his message. Instead, he was asked to leave

because he lacked valid credentials in a restricted area.

The District Court was correct in finding that there was no genuine issue of material fact as to whether Blankenship was removed because of the content of his message. The restriction at issue was clearly content neutral.

### iii.     The restriction at issue survives intermediate scrutiny.

The District Court correctly held that the restrictions on Blankenship's speech survived intermediate scrutiny. [RE 101 at PageID# 1332.] The court noted that "[t]he ticketed area was narrowly tailored to serve Metro's significant interests in traffic control and public safety" while leaving open "ample alternative channels for Blankenship to share his message with essentially the same audience." [*Id.*]

In practice, "a content-neutral time, place, or manner restriction can survive intermediate scrutiny if defendants make three showings." *Reform Am.*, 37 F.4th at 1149. First, "the restricted area must have served a 'significant governmental interest.'" *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Second, the restriction "must have been 'narrowly tailored' to that purpose, meaning that the restriction survives so long as the governmental interest "would [have been] achieved less effectively" in its absence." *Id.* (citing *Ward*, 491 U.S. at 791). Finally, "it must have left open 'ample alternative channels for communication of the information.'" *Id.* (citing *Ward*, 491 U.S. at 791).

### a. The restriction served a significant governmental interest.

The District Court again relied on *Reform Am.* to conclude that the restricted area where Blankenship was trespassing served a significant government interest. [RE 101 at PageID# 1330-1331.] In *Reform Am.*, this court found that safety and security at an event was a significant government interest: "Public safety and security against potential violence are no doubt significant governmental interests; *indeed, this circuit has held that they are compelling state interests that can survive even strict scrutiny.*" 37 F.4th at 1150 (emphasis added). Here, the District Court recognized that with approximately 160,000 people "traveling through the area surrounding Churchill Downs [for the Kentucky Derby], Metro's interests in traffic management and public safety were significant." [RE 101 at PageID# 1331.]

The Kentucky Derby is one of the largest sporting events in the world. When Churchill Downs submitted its application for the Event Permit, they estimated peak single day attendance for the 2022 Derby to be 160,000. [Record Summary for Special Event Permit, RE 55-3, Page ID# 475.] The entire purpose of Churchill Downs' permit application was "[t]o protect the venue and spectators attending the events at Churchill Downs" and planning "accounted for perimeter and event security, traffic control and access, and safety and medical in support of the Kentucky Oaks and Kentucky Derby 148." [*Id.* at Page ID# 487.] Security for the Kentucky Derby requires a large team of experts to work together and create a

security and safety plan. [Ball Dep. at 15:3-13, RE 76-1, PageID# 1152.] Public safety and security against potential violence at the Kentucky Derby, one of the largest sporting events in the world attended by nearly 160,000 people, is a compelling state interest.

Blankenship argues that "the fear of disturbance during special events cannot justify the infringement of First Amendment rights." [Blankenship Brief at 36.] Yet this Court found otherwise in *Reform Am.*: "virtually any large, high-profile event . . . carries with it the risk for violence, whether or not law enforcement has some specific tip that the event may be in danger from some specific individual." 37 F.4th at 1150. In fact, "[t]o hold that law enforcement could not establish a restricted area around such an event without a known, specific threat would make it essentially impossible to guard against terroristic violence, which is effective precisely because it is unpredictable." *Id.* This Court therefore disagrees with Blankenship's argument.

Blankenship analogizes *Saeig v. City of Dearborn* to this case for the proposition that "a leafletting restriction enforced on public sidewalks outside a permitted festival area . . . did not serve a substantial government interest, and therefore failed intermediate scrutiny." [*Id.*] (citing 641 F.3d 727, 737 (6th Cir. 2011)). As previously discussed in *supra* Section I(A)(i), this Court found in *Saeig* that "[t]wo activities that Festival organizers permit on sidewalks abutting Warren Avenue erode the significance of the government's interest in restricting leafleting

on those same sidewalks." *Id.* The first activity was that "Festival organizers keep sidewalks that are adjacent to Warren Avenue open for public traffic." *Id.* The court explained that "the defendants have chosen to keep the sidewalks open for public use, showing that the interests in crowd control and public safety are not so pressing that they justify restricting normal activity that occurs on streets and sidewalks." *Id.* The second activity was that "Festival organizers permit sidewalk vendors on the sidewalks that are adjacent to Warren Avenue, belying the significance of their interest in clear sidewalks and crowd control." *Id.* The court explained "[b]y permitting the more obstructive sidewalk tables in the same place where Saieg wishes to leaflet by foot, the defendants have undercut the credibility of the asserted government interests." *Id.* at 737-38.

Saieg is easily distinguishable. First, the event in *Saieg* was "free and open to the public." Again, the Kentucky Derby was not a "free and open to the public," a fact that Blankenship concedes: "*While the Kentucky Derby itself is not free and open to the public . . .*" [Blankenship's Brief at 41 (emphasis added).] Second, the portion of Central Avenue where Blankenship was arrested was closed to traffic. [Event Permit, RE 52-2, PageID# 267.] In fact, numerous streets and side streets surrounding Churchill Downs were closed and restricted. [*See id*.] Unlike *Saieg*, the street closures around Churchill Downs show that the interests in crowd control and public safety were pressing enough to justify restricting normal activity that occurs

on streets and sidewalks. Third, Churchill Downs did not allow street vendors or other sidewalk obstructions in the restricted area. *Saieg* is not analogous to this case.

Blankenship also claims that "everyone except Blankenship and his group were exempt" which "severely diminishes the credibility of the rationale for restricting speech in the first place." [Blankenship's Brief at 39.] The record reflects otherwise, as KSP Major Matt Johnson confirmed that KSP removed other groups "that weren't allowed to be there based upon not having an—not having either credentials or a ticket for the event." [Johnson Dep. at 38:8-11, RE 55-7, PageID# 544.]

### b.     The restriction was narrowly tailored.

Relying on *Reform Am.*, the District Court found that the restriction was narrowly tailored. [RE 101 at PageID# 1331.] The *Reform Am.* court found that the policy at issue was narrowly tailored to achieving the event's safety and security. 37 F.4th 1138, 1150-51 (6th Cir. 2022). The court indicated that, "in the context of intermediate scrutiny as applied to a content-neutral time, place, or manner restriction, we simply ask whether the state would have achieved its asserted interest 'less effectively absent the regulation.'" *Id*. (quoting *Ward*, 491 U.S. at 799). The *Reform Am.* court then held that the city easily satisfied the standard because, without the restricted area, "officers would have had no control over which or how many individuals were present in the immediate vicinity of the [venue]." *Id*. Further, "[t]he

restricted area ensured that only credentialed individuals were within the [venue's] immediate vicinity, producing a smaller and more manageable crowd for law enforcement to superintend." *Id.* The officers "would have achieved that interest less effectively absent the restricted area," and therefore the restriction was narrowly tailored. *Id*.

Here, just like *Reform Am.*, any policy restricting access in the Churchill Downs permitted area to ticketholders is also narrowly tailored. The District Court acknowledged that "Churchill Downs' safety and security plan is what provided measures for handling massive crowds around Churchill Downs." [RE 101 at PageID# 1331.] Further, "implementing that plan would not have been possible without the event permit issued under Metro's permitting scheme." [*Id.*] The District Court noted that without an event plan in place, the 160,000 person crowd attending the Kentucky Derby "would have been essentially unmanaged at least up to the borders of Churchill Downs' private property." [*Id.*] Without the restricted area and security plan's safety measures, "Metro could not have conceivable achieved its interests as effectively . . ." [*Id.*]

Blankenship argues that "Metro has not expressed a government interest that could be narrowly tailored" because it "granted Churchill Downs exclusive control over public property by virtue of a non-exclusive permit." [Blankenship's Brief at 40.] As such "[b]y ceding complete control over public property to a private entity,

authorizing and enforcing the exclusion of Blankenship simply because he was unwanted, Metro and Young burdened substantially more speech than necessary." [*Id.* at 41.]

First, Metro did not cede "complete control" to Churchill Downs. For instance, the permit did not allow Churchill Downs to "do anything that is outside of established law." [Deposition of Doug Sweeney at 34:15-34:22, RE 59-3, PageID# 868.] The permit did not authorize Churchill Downs to exclude anyone for discriminatory purposes. [*Id.* at PageID# 869.] The notion that Metro willingly provided Churchill Downs with complete authority to exclude individuals for discriminatory purposes, which was not the cause of Blankenship's removal, is simply untrue.

Second, Blankenship's argument relies on the allegation that he was removed "simply because he was unwanted." Again, Blankenship and his associates were not the only group that KSP asked to relocate, and the record reflects that the sole criterion for exclusion was Blankenship's lack of credentials and trespassing. There is no evidence that Blankenship was removed and arrested for the content of his speech.

### c. Blankenship was offered alternative channels of communication.

Finally, relying on *Reform Am.*, the District Court found sufficient alternative channels of communication. [RE 101 at PageID# 1331.] The ultimate inquiry is

"whether the proffered alternatives allow the speaker to reach [his] intended audience." 37 F.4th at 1151. In *Reform Am.*, the Court found that "the restricted area left open 'ample alternative channels of communication' for [plaintiff] to spread its message." *Id*. (quoting *Ward*, 491 U.S. at 799). There, the plaintiff could spread their message "virtually anywhere outside the restricted area." *Id*. Similarly here, "if Blankenship had moved a half-block east when instructed, he would have had ample opportunity to communicate with the same audience . . . . Given the temporary fencing throughout the permitted area, there is no question that Blankenship would have encountered virtually all of the same individuals he encountered in the ticketed area." [RE 101 at PageID# 1332.] Non-ticket holders could preach anywhere outside of the restricted area, and, in fact, many people moved outside of the restricted area to continue preaching to the same audience. Blankenship refused.

Blankenship argues multiple times throughout his brief that he "was not even given the option to move, [sic] but simply was arrested and removed from the area." [Blankenship's Brief at 43.] Yet Blankenship's own video footage betrays that argument. Blankenship and his group were approached by two Churchill Down security guards a little less than twenty minutes after they set up in the restricted zone. The first security guard clearly stated to Joseph Estephane, "ya'll gotta go, you're trespassing right now." [Full Preach May 7 Kentucky Video, RE 62 at 13:08:35.] A second uniformed security guard approached as the first security guard

continued speaking with Mr. Estephane. [*Id.* at 13:09:08.] Blankenship interjected and stated to Mr. Estephane, "hey, hey don't even argue with them, they're security guards." [*Id.* at 13:09:33.] Shortly after, the second security guard stated, "you can go on the other side all you want," indicating that Blankenship and his group were free to move outside the restricted zone and continue preaching. [*Id.* at 13:10:35.] Blankenship was given the option to move but refused because of his stated position of ignoring security guards. Blankenship was also asked to move by the head of Churchill Downs' security, Josh Ball, and KSP troopers immediately before his arrest. In Blankenship's video footage, as the KSP troopers engage the preachers, Blankenship asks "what's going on?" to which a trooper stated, "you're trespassing." [*Id.* at 14:18:25.] The trooper reiterated to Blankenship, "you've been warned multiple times—you can leave—listen—you can leave, or you're gonna go like him—right now." [*Id.* at 14:18:33.] Blankenship agreed to leave, but continued to argue with the troopers stating, "you guys don't know the law" and "I haven't been warned one time." [*Id.* at 14:18:40-14:19:16.] Blankenship was again given the option to leave the restricted area but refused.

Blankenship also argues, without evidentiary support, that "[e]ven had he been given the choice to move outside the signed area, he would only have been able to reach a smaller number of people." [Blankenship's Brief at 43.] This argument is entirely nonsensical. Blankenship was asked by Churchill Downs security to move

just beyond the restricted area, or half a block east of where they were standing. [*See* Full Preach May 7 Kentucky Video, RE 62 at 13:10:35.] All the individuals that Blankenship and his group were preaching to would have necessarily passed by them if they were standing just outside the restricted area. As the District Court explained, "common sense suggests that if anything, [Blankenship] would have encountered more individuals where both ticketholders and non-ticket holders were travelling. The broader permitted area and nearby unrestricted areas were available to Blankenship." [RE 101 at PageID# 1332.]

**B.    Free Exercise Claim**

Blankenship's complaint includes a Free Exercise claim against Metro. [RE 1 at PageID# 16.] The District Court recognized that Blankenship "hardly distinguishe[d]" his Free Speech and Free Exercise claims throughout his briefing. [RE 101 at PageID# 1332.] Similarly, Blankenship's brief before this Court barely mentions his Free Exercise claim and focuses almost exclusively on his Free Speech claim. Regardless, Metro will briefly address Blankenship's Free Exercise claim.

The District Court found that while the Free Speech and Free Exercise Clauses often work in tandem, "such claims call for different modes of analysis." [*Id.* at PageID# 1333.] Prevailing jurisprudence dictates that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect on burdening a particular religious practice."

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*., 508 U.S. 520, 531 (1993). As the District Court noted, "[a] rule of general application, in this sense, is one that restricts religious conduct the same way that 'analogous non-religious conduct' is restricted." [RE 101 at PageID# 1333 (quoting *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020)).]

The District Court correctly noted that "nowhere does [Blankenship] allege that the permitting scheme was enacted with the intent of discriminating against religion." [RE 101 at PageID# 1333.] Instead, "the ticketed area restricted Blankenship's preaching no differently than it restricted non-religious conduct." [*Id.*] Again, Blankenship was arrested for his lack of credentials, not his speech or expression of religion. The District Court succinctly summarized the reason that Blankenship's Free Exercise claim failed: "It was not unconstitutional to prohibit Blankenship from doing what no one else was permitted to do—linger in the ticketed area without a ticket." [*Id.*]

## C.  Due Process Claim

The District Court recognized that Blankenship's arguments that Metro's permitting scheme is void for vagueness were "scant and less than clear." [RE 101 at PageID# 1334.] Blankenship dedicates just over a single page of his brief discussing his Due Process claim. He argues that "Metro's Policy is vague, and allows for unbridled discretion in enforcement." [Blankenship's Brief at 53.] The

District Court should be affirmed based on its finding that Blankenship's Due Process claim "bears two fatal defects." [RE 101 at PageID# 1334.]

First, "[a]n individual must establish that he . . . has been deprived of a life liberty, or property interest sufficient to trigger the protection of the Due Process Clause to raise a void-for-vagueness challenge to a statute." *West v. Kentucky Horse Racing Comm'n*, 975 F.3d 881, 892 (6th Cir. 2020) (internal citations omitted). The District Court correctly noted that "Blankenship has not tethered his due process void-for vagueness claim to any liberty or property interest" and therefore, this claim failed "as a matter of law." [RE 101 at PageID# 1335.] Blankenship does not address this in his brief.

Second, the court found that Blankenship's Due Process claim also failed because he was "simply not subjected to the law he challenges." [RE 101 at PageID# 1335.] The District Court recognized that "Churchill Downs was the permit applicant and event-holder, not Blankenship," and that "Metro's permitting scheme neither forbid nor required any action of Blankenship, and it did not threaten him with any offense." [*Id.*] Again, Blankenship does not address this in his brief.

III. **Metro was entitled to summary judgment because Blankenship failed to establish that an unconstitutional custom, policy, or practice violated his rights.**

The District Court's opinion set forth a well-reasoned, detailed legal analysis of Blankenship's free speech, free exercise, and due process claims. As explained

above, the District Court's analysis is a correct interpretation of the law and the granting of summary judgment in favor of Metro and Young should be affirmed. However, Metro also maintains that summary judgment is independently appropriate here because Blankenship's failed to establish that an unconstitutional custom, policy, or practice of Metro caused a violation of one or more of his rights. [*See* RE 52-1 at PageID# 247].

To prevail in a § 1983 suit against a municipality, a plaintiff "must show that the alleged federal right violation occurred because a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978)). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Id.* Additionally, a plaintiff must show that there is a "direct causal link between the policy and the alleged constitutional violation" to show that the illegal policy is the "moving force" behind the alleged violation. *Id*. (internal citations omitted).

The District Court did not reach the question of *Monell* liability because it found no underlying constitutional violation, therefore there was nothing to hold

Metro liable for. [RE 101 at PageID# 1336 (citing *Chambers v. Sanders*, 63 F.4th 1092, 1101 (6th Cir. 2023) ("There can be no liability under *Monell* without an underlying constitutional violation.").] While Metro agrees with this and urges this Court to affirm, Metro also reiterates that even if there were a constitutional violation, Blankenship failed to identify any evidence of a direct causal link between Metro's permitting scheme and that alleged violation.

First, Blankenship has failed to point to the existence of an illegal official policy or legislative enactment. He argues broadly that "[t]he arrest and removal of Blankenship was authorized by Metro pursuant to its permitting scheme." [Blankenship's Brief at 48-49.] Yet, as cited above, Doug Sweeney testified that the "permit issued by the City does not authorize them to do anything that's outside of the scope of existing law." [Sweeney Dep. at 39:17-19, RE 59-3, PageID# 869.] While the "permit gives them the right to conduct their operations within the area they control," [*id.* at PageID# 867.], Mr. Sweeney clearly testified that Churchill Downs was required to "operate within the boundaries of what is -- is established law at that time. And the permit gives them no authority to do anything beyond that." [*Id.* at PageID# 873.] While Blankenship peddles the allegation that Metro granted Churchill Downs unbridled authority to do as it pleases, Mr. Sweeney's undisputed deposition testimony proves otherwise.

Second, there is no evidence that a Metro official with final decision making authority ratified the allegedly illegal action. Blankenship testified that no Louisville Metro police officers were involved in his arrest or charges. [Blankenship Dep. at 47:18-49:6, RE 55-9, PageID# 672-674.] Blankenship had no communications or interactions with anyone from or associated with Metro, nor did any communication from Metro lead to Plaintiff's arrest. [*Id.*] Louisville Metro Police Department's only involvement in the vicinity at the time was traffic control. [Sweeney Dep. at 29:18-24; 81:2-82:3, RE 52-2, PageID# 257, 263-64.] Blankenship concedes multiple times throughout his brief that Metro was not directly involved in his arrest; rather, he argues that Churchill Downs directed KSP to arrest him. [*See* Blankenship Brief at 41 ("Churchill Downs then had Blankenship arrested and removed, calling him 'unauthorized. . .'"); *id.* at 5 ("Young arrested Blankenship for criminal trespass.").] Major Matt Johnson, KSP's commanding officer for the event, testified that KSP would not have arrested Blankenship without direction from Churchill Downs. [Johnson Dep. at 59:14-17, 55-7, PageID# 565.]

Third, Blankenship makes no argument that inadequate training resulted in his arrest. Accordingly, Blankenship has made no claim under this theory.

Fourth, Blankenship has failed to identify the existence of a custom of tolerance or acquiescence of federal rights violations. Blankenship argues his arrest was illegal and identifies no other violation. The Sixth Circuit does not allow an

inference of a municipal-wide policy "based solely on one instance of potential misconduct." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005). In sum, "[t]his argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard." *Id*. Thus, "[t]his path to municipal liability has been forbidden by the Supreme Court." *Id*. (citing *Monell,* 436 U.S. at 694; *cf. Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 410 (1997)).

## CONCLUSION

Metro requests that this Court affirm the District Court's order granting Metro and Young's separate motions for summary judgment and denying Blankenship's motion for summary judgment. [RE 101.]

Respectfully submitted,

*/s/ Bruce B. Paul*
Bruce B. Paul
William G. Carroll
**McBrayer PLLC**
500 West Jefferson Street, Suite 2400
Louisville, Kentucky 40202
(502) 327-5400
bpaul@mcbrayerfirm.com
wcarroll@mcbrayerfirm.com
*Counsel for Appellee, Louisville-Jefferson County, Kentucky Metro Government*

## CERTIFICATE OF COMPLIANCE

This Brief for Appellee complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 10,979 words excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Local Rule 32(b)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in 14-point Times New Roman.


Date: July 2, 2025                    */s/ Bruce B. Paul*
                                       Bruce B. Paul



## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was filed electronically on July 2, 2025, and will be served upon all counsel of record via the Court's CM/ECF system.

                                      */s/ Bruce B. Paul*
                                       Bruce B. Paul

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RE | DESCRIPTION | PAGEID# |
|---|---|---|
| 1 | Complaint | 1 |
| 30 | Memorandum Opinion and Order | 158-74 |
| 52 | Metro's Motion for Summary Judgment | 240-41 |
| 52-1 | Memorandum in Support of Metro's Motion for Summary Judgment | 242-52 |
| 52-2 | Doug Sweeney Depo. Transcript | 253-64 |
| 52-2 | Google Maps Screen Capture (exhibit to Sweeney Depo.) | 265 |
| 52-2 | Event Permit (exhibit to Sweeney Depo.) | 266-67 |
| 52-5 | No Trespassing Sign | 287 |
| 55 | Trooper Youngs' Motion for Summary Judgment | 341-42 |
| 55-2 | Trooper Young Depo. Transcript | 359-471 |
| 55-3 | Churchill Downs' Permit Application | 472-501 |
| 55-7 | Maj. Matt Johnson Depo. Transcript | 506-624 |
| 55-8 | Jacob Blankenship Depo. Transcript | 625-710 |
| 55-9 | Jacob Blankenship Arrest Citation | 711 |
| 55-10 | Docket Sheet | 712 |
| 58 | Blankenship's Motion for Summary Judgment | 717-47 |
| 59-3 | Doug Sweeney Depo. Transcript | 864-77 |
| 62 | Full Preach May 7 Kentucky Video | 937-38 |
| 71-1 | Capt. Jeremy Smith Depo. Transcript | 1001-68 |

| 76-1 | Josh Ball Depo. Transcript | 1151-56 |
|---|---|---|
| 101 | Memorandum Opinion and Order | 1316-39 |

4908-1453-4736, v. 2