25-5014

_____

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

_____

**JACOB GLENN BLANKENSHIP, AS AN INDIVIDUAL,**

**Plaintiff-Appellant,**

**v.**

**LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, ELLIOTT YOUNG, IN HIS INDIVIDUAL CAPACITY AND ACTING AS A TROOPER/OFFICER FOR KENTUCKY STATE POLICE,**

**Defendants-Appellees.**

_____

On appeal from the United States District Court
For the Western District of Kentucky
Case No. 3:23-cv-00235

_____

**REPLY BRIEF OF APPELLANT JACOB BLANKENSHIP**

_____

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

ARGUMENT.....................................................................................................1

I. THE DISTRICT COURT ERRED BY NOT FINDING THAT THE PERMITTED AREA WAS A TRADITIONAL PUBLIC FORUM...............................................1

II. THE RESTRICTION OF BLANKENSHIP'S SPEECH WAS NOT A REASONABLE TIME, PLACE, AND MANNER RESTRICTION.......................2

A. The Exclusion of Blankenship was not Content Neutral.....................................3

B. Even if the Exclusion of Blankenship was Content Neutral, it Did Not Serve a Significant Government Interest ............................................................................7

C. The Exclusion of Blankenship Was Not Narrowly Tailored to Serve any Government Interest ...........................................................................................12

D. The Restriction on Blankenship's Speech Did Not Leave Open Ample Alternative Channels of Communication..................................................................................14

III. BLANKENSHIP PREVAILS ON HIS FREE EXERCISE CLAIM FOR THE SAME REASONS HE PREVAILS ON HIS FREE SPEECH CLAIM .................15

IV. THE DUE PROCESS CLAUSE'S VAGUENESS DOCTRINE APPLIES TO BLANKENSHIP'S FIRST AMENDMENT CLAIMS.........................................16

V. METRO IS LIABLE UNDER *MONELL* FOR THE CONSTITUTIONAL VIOLATIONS .....................................................................................................17

VI. TROOPER YOUNG IS NOT ENTITLED TO QUALIFIED IMMUNITY ....20

CONCLUSION .................................................................................................23

CERTIFICATE OF COMPLIANCE...................................................................24

CERTIFICATE OF SERVICE............................................................................25

## CASES

*Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228 (6th Cir. 2015) ................... 16

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ........................................... 14

*Grendell v. Ohio Supreme Court*, 252 F.3d 828 (6th Cir. 2001) ........................... 22

*McCurry v. Tesch*, 738 F.2d 271 (8th Cir. 1984) .................................... 15

*McGlone v. Cheek*, 534 Fed. Appx. 293 (6th Cir. Aug 02, 2013) ................... 16-17

*McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076 (N.D. Fla. 2016) .... ..................................................................................... 11

*Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ........ 17, 19

*National Rifle Ass'n of America v. Magaw*, 132 F.3d 272 (6th Cir. 1997) ............. 22

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ....................................... 19

*Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005) .................................. 3-4

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ...................................... 19-20

*Reform America v. City of Detroit, Michigan*, 37 F.4th 1138 (6th Cir. 2022) ........ 10

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ............ 1

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) ................................... 7-9

*Schneider v. State of New Jersey*, 308 U.S. 147 (1939) ......................................... 15

*Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ......................................... 20

*Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996) ................................ 11

*St. Paul Guardian Ins. Co. v. City of Newport*, 804 Fed. Appx. 379 (6th Cir. 2020) ....................................................................................................................20

*Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) ......................18

*Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503 (1969) ................10

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) .........................................7

*United States v. Grace*, 461 U.S. 171 (1983)...................................................... 1-2

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ....................................................................................................................17

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .............................................12

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002) ....................................................................................................................16

*World Wide Street Preachers' Fellowship v. Reed*, 430 F. Supp. 2d 411 (M.D. Pa. 2006) ................................................................................................................ 14-15

## RULES

Fed. R. Civ. P. 30(b)(6)................................................................................6, 8, 22

Fed. R. App. P. 32(a)(5)........................................................................................24

Fed. R. App. P. 32(a)(6)........................................................................................24

Fed. R. App. P. 32(a)(7)(B)...................................................................................24

Fed. R. App. P. 32(f)..............................................................................................24

6 Cir. R. 32(b)(1) ..................................................................................................24

## CONSTITUTION

First Amendment .............................................................................9, 13, 15, 16

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY NOT FINDING THAT THE PERMITTED AREA WAS A TRADITIONAL PUBLIC FORUM

Both Metro and Trooper Young argue that the District Court correctly found that the nature of the forum is irrelevant because the exclusion of Blankenship from the permitted area was content neutral. (Brief of Appellee Louisville-Jefferson County, Kentucky Metro Government ("Metro Brief") at 18-21; Brief of Appellee, Trooper Elliott Young ("Young Brief") at 12-16). Metro argues: "By spending much of his brief arguing that the District Court erred in determining the nature of the forum at issue [Brief of Appellant at 32-30] [sic], Blankenship ignores the District Court's correct statement of law that 'if the restriction of Blankenship's speech was content-neutral, it makes no difference whether Blankenship was arrested in a traditional or limited public forum.'" (Metro Brief at 18). First, this statement is not true. Blankenship pointed out that the standard for a content-neutral restriction on speech in a limited public forum appears to be different from a reasonable time, place, and manner restriction in a traditional public forum. (Brief of Appellant Jacob Blankenship ("Initial Brief") at 21 n.1). In the former, a restriction on speech must be reasonable and viewpoint neutral. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). In the latter, a restriction must be content-neutral, narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication. *United States v. Grace*, 461 U.S. 171,

177 (1983). Neither Metro nor Trooper Young address this apparent discrepancy. Thus, even if this Court holds that the exclusion of Blankenship from the permitted area was content neutral, it is at least unclear whether the standard is the same. Nonetheless, as Blankenship argues in his Initial Brief, Appellees' actions fail under either content-neutral standard.

More importantly, the District Court's conclusion was based upon the fact that the exclusion of Blankenship was content neutral. (Memorandum Opinion and Order (the "Order"), RE-101, PageID# 1327-1332). As Blankenship argues thoroughly in his Initial Brief, his exclusion from the permitted area was not content neutral, and strict scrutiny applies. Thus, while the nature of the forum is not ultimately dispositive because Blankenship prevails under strict scrutiny (Initial Brief at 32-36), the reasonable time, place, and manner standard (Initial Brief at 36-36-44), and the limited public forum standard (Initial Brief at 47-48) (to the extent this Court agrees that the latter two are different), the issue is not irrelevant.

## II.    THE RESTRICTION OF BLANKENSHIP'S SPEECH WAS NOT A REASONABLE TIME, PLACE, AND MANNER RESTRICTION[1]

Neither Metro nor Trooper Young argue that, if the exclusion of Blankenship from the permitted area was not content neutral, it nonetheless satisfied strict

---

[1] It must be noted that neither Appellee addresses the reasonable and viewpoint neutral standard of a limited public forum. For the reasons set forth in Blankenship's Initial Brief, even if the permitted area is a limited public forum, Appellees' conduct does not satisfy constitutional scrutiny. (Initial Brief at 47-48).

scrutiny. Thus, if this Court holds that the exclusion was not content neutral, Blankenship stands on the relevant argument he made in his Initial Brief that his exclusion did not satisfy strict scrutiny. (Initial Brief at 32-36). Moreover, the exclusion of Blankenship does not satisfy intermediate scrutiny.

### A.    The Exclusion of Blankenship was not Content Neutral

As argued thoroughly in Blankenship's Initial Brief (Initial Brief at 32-35), Appellees' exclusion of Blankenship was not content neutral. Metro quotes the District Court: "The purpose of establishing the permitted area—facilitating ingress and egress for Churchill Downs—can be justified without reference to the content of any speech." (Metro Brief at 21) (quoting the Order, RE-101, PageID# 1329). However, Blankenship did not bring a facial challenge; his claim is as applied. He is not challenging the establishment of the permitted area. Whatever the purpose of creating the permitted area, Blankenship's exclusion from it was based on the content of his message, as Blankenship has argued. Metro's Policy was unconstitutional as applied to Blankenship.

As argued in Blankenship's Initial Brief, this Court's case *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005) is on point. (Initial Brief at 34). Metro attempts to distinguish *Parks* based on the single fact that, in *Parks*, the festival was free and open to the public. (Metro Brief at 28). They continue to hang their hat on the presence of the No Trespassing sign. However, they do not ever address the

undisputed fact that no one was checking for tickets, the public came in at will, and no one ever even asked Blankenship if he had a ticket. In any event, the operative language in *Parks* is:

> There is no evidence that the Arts Council had a blanket prohibition on the distribution of literature or that others engaging in similar constitutionally protected activity were removed from the permitted area. While the district court did not reach the question of whether the removal of Parks was based on the content of his speech, under these circumstances **we find it difficult to conceive that Parks's removal was based on something other than the content of his speech**.

*Id.* at 647 (emphasis added). The point here is that there was no explanation for the removal of Parks other than the content of his message. That holding applies here where, despite the purported removal of Blankenship because he had no ticket, the record is clear that no ticket requirement was being applied or enforced in the permitted area, and the public was free to come and go with or without a ticket. Blankenship was never even told he needed a ticket; just that he had to leave.

Young argues: "No witness in this action disputed Trooper Young's statement that if Blankenship had a ticket for the Kentucky Derby, he would merely have 'asked him to continue preaching if he felt the need to do so, to refrain from some of the inciteful language he was using, but to remain -- that he -- he could stay there as long as he had plans on entering the premises at some point within a reasonable time.' [*Id.* at PageID # 425]." (Young Brief at 7) (*see also* 16, 20-21). First, the reference to "inciteful language" clearly is about content. Further, it is important to

note that Young *did not know* whether Blankenship had a ticket; no one ever asked. If the sole issue was lack of a ticket, which Appellees argue, they would have asked him to show a ticket, or they would have confirmed that he did not have one. They never even asked, because that was not the issue.

Young argues further that Blankenship claims that the District Court erred because it did not find Kentucky's criminal trespass statute to be content neutral. (Young Brief at 12-13). Blankenship has never made such an argument, and Young essentially concedes as much when he follows up his argument by stating that "Blankenship does not mention the law under which Trooper Young arrested him." (*Id.* at 13). Blankenship is not challenging the trespass statute. His claims are as applied. Churchill Downs purported to trespass Blankenship from public property because of Metro's unconstitutional permitting Policy, authorized by the Code. Young argues that he had no knowledge of the permit or the permitting process, and that his understanding was that the area was to be treated like private property. (Young Brief at 13-14). However, Young cannot simply claim ignorance of the law. As set forth below and in Blankenship's Initial Brief, there is no qualified immunity for injunctive and declaratory relief, which are the crux of this case. Young enforced an unconstitutional Policy. While he may have been ignorant of that fact, it was still unconstitutional, and he is liable.

Young argues that Blankenship's argument that "'[e]ven if Churchill Downs had an exclusive permit, it did not require tickets to enter the arrest area[,]'" is unsupported by the record, quoting Sweeney, Metro's Rule 30(b)(6) witness. (Young Brief at 15). Sweeney testified that Churchill Downs controlled the property and could decide where they wanted to review tickets. (*Id.*) (quoting Deposition of Doug Sweeney as Rule 30(b)(6) witness for Louisville-Jefferson County Metro Government ("Metro Depo."), RE-59-3, PageID# 1101). The issue is, as applied, no tickets were required to enter the area. No one checked, no one asked, and the public came in freely, regardless of what Sweeney said Churchill Downs *could* do. The fact is, *they did not*. Young argues that he did not ask whether Blankenship had a ticket because he had been informed by Churchill Downs that he was trespassing. (*Id.*). However, Churchill Downs never asked either. No one did, and no one ever confirmed – or apparently cared – whether Blankenship had a ticket. There simply was never a ticket requirement.

Metro argues that the permit did not give Churchill Downs unbridled discretion because they could not do anything outside the law: "as Mr. Sweeney described, the Event Permit permitted only legal exclusions such as trespassing due to lack of credentials." (Metro Brief at 30). This statement is not consistent with Sweeney's testimony. First, Sweeney testified that Churchill Downs could treat the area like their private property. (Metro Depo., RE-59-3, PageID# 875). Second,

Sweeney testified that excluding people selectively, while it would be unlawful, would not necessarily violate the permit. (*Id.*, PageID# 869). Thus, according to Metro's own witness, the permit did not prevent Churchill Downs from discriminating against unwanted members of the public. Neither Appellee addresses this testimony.

## B. Even if the Exclusion of Blankenship was Content Neutral, it Did Not Serve a Significant Government Interest

Even if this Court holds that the exclusion of Blankenship was content neutral, it was not a reasonable time, place, and manner restriction because it did not serve any significant government interest. Metro argues that safety and traffic control are significant interests. (Metro Brief at 32). However, this is a general statement. Blankenship is not saying no event can ever have a restricted area. Again, Blankenship's claims are as applied. Here, Blankenship was removed from the permitted area while everyone else was able to come and go without any ticket required. While, in general, safety and traffic control are significant interests, neither was served here by removing Blankenship. In *Saieg v. City of Dearborn*, 641 F.3d 727, 736-37 (6th Cir. 2011), this Court held: "The defendants must do more, however, than 'assert[ ] interests [that] are important in the abstract'" (quoting *Turner Broad. Sys., Inc. v. F.C.C.* 512 U.S. 622, 664 (1994)). This Court held further:

> Even though the leafleting restriction is content neutral and might
> provide ample alternative means of communication, the policy is not a
> reasonable time, place, and manner restriction. Within the inner
> perimeter, the restriction does not serve a substantial governmental
> interest, as evidenced by the defendants' willingness to permit sidewalk
> vendors and ordinary pedestrian traffic on the same sidewalks where
> they prohibited Saieg from leafleting.

*Id.* at 740-41. Here, the fact that "ordinary pedestrian traffic" was allowed to come

and go without presenting a ticket belies the alleged need to remove Blankenship

based on safety.

Moreover, Metro cannot plausibly argue that it had a significant interest.

Sweeney, Metro's Rule 30(b)(6) witness, testified that, with respect to the placement

of the No Trespassing sign: "No difference to me. This is just—apparently happens

to be where they decided they want to start checking credentials." (Metro Brief at 6)

(quoting Metro Depo., RE 59-3, PageID# 869). Essentially, Metro did not care what

Churchill Downs did once they had the permit; it was their "private property." What

Metro has not given is any significant interest served by ceding complete control

over public property to a private entity to do with what they pleased.

Metro attempts to distinguish *Saieg*. First, they argue that the event in *Saieg*

was not free and open to the public. (Metro Brief at 34). However, that distinction

does not serve their argument. They cannot plausibility argue that, when an event is

free and open to the public, safety and traffic control are not significant interests.

The event organizer in *Saieg* attempted to argue the same interests as Metro puts

forth here, 641 F.3d at 736; this Court rejected their argument based on selective application, *Id.* at 740-41, which also is present here. Further, Metro claims that Blankenship conceded that the Kentucky Derby was not free and open to the public. (Metro Brief at 34). What Blankenship concedes is that the Kentucky Derby itself was not free and open to the public. Presumably, at some point a member of the public would have been required to present a ticket to enter the racetrack. As the undisputed record shows, no one was required to present a ticket to enter the area where Blankenship was arrested, notwithstanding the presence of any sign. That is the only area that matters for purposes of this case.

Metro further tries to distinguish *Saieg* by arguing that the area was closed to traffic. (Metro Brief at 34-35). First, the area in *Saieg* was closed to vehicular traffic as well. 641 F.3d at 731. Thus, that fact does not distinguish *Saieg*. Further, the relevant point for purposes of this case is that the area was not closed to foot traffic. Blankenship was not in a car. Other pedestrians were allowed through the area without having to produce a ticket. Metro attempts to distinguish *Saieg* by noting that Churchill Downs did not allow street vendors. (Metro Brief at 35). However, *Saieg* was not just about street vendors. This Court observed: "Festival organizers keep sidewalks that are adjacent to Warren Avenue open for public traffic." 641 F.3d at 737. The presence of street vendors was not dispositive in *Saieg*.

Metro addresses Blankenship's argument that "'the fear of disturbance during special events cannot justify the infringement of First Amendment rights.'" (Metro Brief at 33) (quoting Initial Brief at 36). They claim that "this Court found otherwise in *Reform Am.* [*v. City of Detroit, Michigan*, 37 F.4th 1138 (6th Cir. 2022)]. (*Id.*). However, Blankenship's assertion comes from *Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 508-509 (1969):

> [U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom – this kind of openness – that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

Obviously, this Court's ruling in *Reform Am.* cannot be read to be inconsistent with the Supreme Court's ruling in *Tinker*.

Young argues: "What matters to Trooper Young, in this portion of the argument, is that Blankenship does not cite any law saying that a city may not temporarily lease or permit a private entity to use land that is normally public, and continue to act as a private business entity on that land while doing so." (Young Brief at 18). However, as Blankenship argued, with case law, a city can issue an exclusive use permit allowing the permittee to exclude people. (Initial Brief at 25)

(citing *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996)). Here, the permit was not exclusive; Churchill Downs could not require a ticket. The fact that Sweeney said they could is more evidence that Metro violated the law. And even with an exclusive permit, a permittee cannot treat the still-public property like it is their own private property. *See McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1106 (N.D. Fla. 2016) ("The City's stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling").

Young follows up his argument: "To the extent Blankenship asks this Court to recognize such a rule for the first time in this appeal [he is not], it only shows that such law was not 'clearly established' when Trooper Young arrested Blankenship and the district court correctly found that Trooper Young was entitled to qualified immunity." (Young Brief at 18-19). As set forth in Blankenship's Initial Brief and below, there is no qualified immunity from claims for injunctive and declaratory relief. There is no "clearly established" standard to be met here.

Young asserts: "Blankenship argues that 'no restricted area was created' by Churchill Downs, where Blankenship was arrested. To the contrary, it is undisputed in the record that the fenced area where he was arrested had 'green signs . . . on either side of the southern Central Avenue sidewalk.'" (Young Brief at 19). However, Blankenship is not arguing that there were no signs. The argument is, first, the signs

were not authorized because the permit was non-exclusive, and second, the signs were outside the area Churchill Downs requested to be ticketed. Moreover, the area was not, in effect, restricted because no credentials were ever required to get into the area, regardless of what the signs said. They cannot simply put up a sign and then selectively enforce it. Either the area is ticket only, or it is not. Here, it was not. In actual effect, the signs were meaningless because no one was enforcing any ticket or credential requirement.

## C.     The Exclusion of Blankenship Was Not Narrowly Tailored to Serve any Government Interest

Even if Metro's interest were to be deemed significant, the enforcement of Metro's permitting Policy was not narrowly tailored to serve that interest. In order for a time, place, and manner restriction to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Neither Metro nor Young address this standard.

Metro argues that the ticket requirement was narrowly tailored. (Metro Brief at 35-36). However, Metro's Policy at issue here was not establishing a ticketed area. It was ceding complete control over public property to a private entity, to treat as their own property. Metro gave Churchill Downs license to exclude anyone for any reason, including discriminatory reasons. Metro quotes Sweeney's testimony that it made "no difference to" him whether Churchill Downs required tickets or not.

(Metro Brief at 6). Churchill Downs set up a No Trespassing sign over an area they did not even request permission to have as ticketed; they checked no one for tickets; and they let people flow through the area freely, with or without tickets, except Blankenship and his group. Blankenship is not challenging the general right to have a ticketed area around a special event. He concedes that municipalities may grant exclusive use permits; Metro did not do so here. They gave a non-exclusive permit, and let Churchill Downs do whatever they wanted with the property, including discriminating. That simply is not narrowly tailored to serve any interest of Metro's.

Metro argues that they did not cede complete control of the area because Churchill Downs could not do anything illegal. (Metro Brief at 37). However, that is no different than private property. Metro argues Churchill Downs could not discriminate. (*Id.*). However, again, that is inconsistent with Sweeney's testimony that excluding people selectively, while it would be unlawful, would not necessarily violate the permit. (Metro Depo., RE-59-3, PageID# 869). There is at least a genuine issue of fact as to whether Metro ceded complete control of the property to Churchill Downs.

Young argues that those preachers who moved as ordered were not arrested. (Young Brief at 22). But their rights were still violated; the issue is not simply that Blankenship was arrested; he was removed. Had he been allowed to leave without being arrested, his rights still would have been violated because he was being

unconstitutionally prohibited from exercising his First Amendment rights in a public forum.

Young also argues that Blankenship does not prevail on a retaliatory arrest claim. (Young Brief at 22-23). However, Blankenship is not making a retaliatory arrest claim, nor does he need to. As stated above, his constitutional rights were violated whether he was arrested or not. He was forced to leave public property while engaging in protected conduct.

### D. The Restriction on Blankenship's Speech Did Not Leave Open Ample Alternative Channels of Communication

Removing Blankenship from his chosen audience did not leave open ample alternative channels of communication. Metro argues that if Blankenship would have moved he could have kept preaching, and that he would have reached the same people. (Metro Brief at 38). First, this argument is inconsistent with Metro's argument that there was a separate ticketed area. If Blankenship would have encountered all the same people, why were only ticketed people allowed past the sign?

More importantly, Appellees do not get to decide where a speaker may reach his chosen audience. A specific place where a message is communicated may be just as important as the message itself. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). Thus, "a location across the street is not an ample alternative channel of communication when [a person] could have been standing in the park." *World Wide*

*Street Preachers' Fellowship v. Reed*, 430 F. Supp. 2d 411, 415 (M.D. Pa. 2006). In other words, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939); *see also McCurry v. Tesch*, 738 F.2d 271, 275 (8th Cir. 1984) (same). Appellees cannot require Blankenship to move because they decided another location was just as good as that chosen by him.

Moreover, again, Metro's role was ceding complete control of the property to Churchill Downs. As Metro noted, as far as it was concerned, Churchill Downs could have moved the No Trespassing sign as far away as Floyd Street. (Metro Brief at 6) (quoting Metro Depo., RE 59-3, PageID# 869). Metro simply did not care, as Sweeney testified it made "no difference to" him. (Metro Depo., RE-59-3, PageID# 869). Metro did not leave open ample alternative channels of communication because they let Churchill Downs exclude anyone from the whole permitted area, including the area "a half-block away" where Metro suggests Blankenship could have moved. (Metro Brief at 38-40).

## III. BLANKENSHIP PREVAILS ON HIS FREE EXERCISE CLAIM FOR THE SAME REASONS HE PREVAILS ON HIS FREE SPEECH CLAIM

Metro contends that Blankenship "barely mentions his Free Exercise claim and focuses almost exclusively on his Free Speech claim." (Metro Brief at 40). In

fact, "[f]ee exercise claims are often considered in tandem with free speech claims and may rely entirely on the same set of facts." *Bible Believers v. Wayne County*, 805 F.3d 228, 256 (6th Cir. 2015) (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002)). In *Bible Believers*, this Court held: "Defendants prevented the Bible Believers from proselytizing based exclusively on the crowd's hostile reaction to the religious views that the Bible Believers were espousing. Therefore, the free exercise claim succeeds on the same basis as the free speech claim." *Id.* (citing *Watchtower Bible*, 536 U.S. at 150, 159 n.8).

Here, Blankenship's free speech and free exercise claims should be considered in tandem, as he prevails on his free exercise claim for the same reason he prevails on his free speech claim, as set forth more fully herein and in Blankenship's Initial Brief.

## IV. THE DUE PROCESS CLAUSE'S VAGUENESS DOCTRINE APPLIES TO BLANKENSHIP'S FIRST AMENDMENT CLAIMS

Metro quotes the District Court in arguing that Blankenship's due process claim suffers from "'two fatal defects.'" (Metro Brief at 42) (quoting Order, RE-101, PageID# 1334). The first is that Blankenship's claim is not tethered to "'any liberty or property interest.'" (*Id.*) (quoting Order, RE-101, PageID# 1335). However, First Amendment rights constitute a liberty interest sufficient to trigger due process rights. In *McGlone v. Cheek*, 534 Fed. Appx. 293, 297 (6th Cir. Aug 02, 2013), this Court, after setting forth the Due Process Clause's vagueness doctrine,

held that the "principle of clarity is especially demanding when First Amendment freedoms are at risk" (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). Clearly, First Amendment rights are protected by the Due Process Clause.

The second alleged defect is that Blankenship was "'not subjected to the law he challenges.'" (Metro Brief at 42) (quoting Order, RE-101, PageID# 1335). However, Blankenship was subject to the purported ticketing requirement. Metro and Young have argued throughout this litigation, including this appeal, that Blankenship was arrested pursuant to the ticketing requirement. This requirement was enforced under the authority of Metro's permit and permitting Policy. Blankenship's rights were violated because of the application and enforcement of the vague Policy that purportedly allowed Churchill Downs to exclude Blankenship from the permitted area.

## V.   METRO IS LIABLE UNDER *MONELL* FOR THE CONSTITUTIONAL VIOLATIONS

While the District Court did not reach the issue of Metro's liability under *Monell*, Metro argues on appeal that it is not liable. Metro attempts to distance itself from the violations of Blankenship's rights, despite the fact that those violations were authorized by Metro's permit and permitting Policy. Metro argues: "While Blankenship peddles the allegation that Metro granted Churchill Downs unbridled authority to do as it pleases, Mr. Sweeney's undisputed deposition testimony proves

otherwise." (Metro Brief at 44). In fact, Sweeney testified that excluding people selectively, while it would be unlawful, would not necessarily violate the permit. (Metro Depo., RE-59-3, PageID# 869). He also testified that it made "No difference to" him where Churchill Downs placed its signs (*id.*), despite the fact that the permit application only requested a particular area be ticketed. At the end of the day, whatever happened in the permitted area, as far as Metro was concerned, was Churchill Downs's call.

Metro concedes as much when it argues that it had no involvement in Blankenship's arrest. (Metro Brief at 45). The point, again, is that Metro authorized Churchill Downs's actions by granting a permit and ceding control of the area to Churchill Downs. In denying Metro's motion to dismiss, the District Court agreed that, "but for" Metro's permit, there would have been no basis to remove Blankenship from the area. (Memorandum Opinion and Order, RE-30, PageID# 163-64). There is, at the very least, a genuine issue of material fact as to whether Metro's Policy resulted in the constitutional violations in this case.

Metro contends that this Court "does not allow an inference of a municipal-wide policy 'based solely on one instance of potential misconduct.'" (Metro Brief at 45-46) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005)). However, Metro granting a permit for the 2022 Kentucky Derby was not a one-time instance. Metro issues a permit to Churchill Downs for the Kentucky Derby every

year. (Metro Depo., RE-59-3, PageID# 866). Moreover, it is Metro's *permitting Policy* that authorized the violations in this case. This case is not about a one-time arrest. It is about Metro's Policy of ceding control of public property to a private entity, Churchill Downs, as it does every year. This abdication of public responsibility for public property directly caused the violation of Blankenship's constitutional rights. It should also be noted that Metro does not address the fact that its permit was non-exclusive, and could not authorize a ticketed area. Moreover, as set forth in Blankenship's Initial Brief, Metro's involvement was more than just issuing a permit; it drafted the language for the sign, was involved in the planning process for security, etc. (Initial Brief at 51-52). Neither Appellee address these facts.

Further, contrary to Metro's argument, the Supreme Court has held:

The opinion below also can be read as holding that municipal liability cannot be imposed for a single incident of unconstitutional *conduct* by municipal employees whether or not that conduct is pursuant to municipal *policy*. Such a conclusion is unsupported by either the language or reasoning of *Monell*, or by any of our subsequent decisions. As we explained last Term in *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), once a municipal policy is established, "it requires only one application . . . to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Id.*, at 822 (plurality opinion); see also, *id.*, at 831-832 (BRENNAN, J., concurring in part and concurring in judgment.). The only issue before us, then, is whether petitioner satisfied *Monell*'s requirement that the tortious conduct be pursuant to "official municipal policy."

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). The issue is the same here. The constitutional violations were "pursuant to 'official municipal policy.'"

## VI. <u>TROOPER YOUNG IS NOT ENTITLED TO QUALIFIED IMMUNITY</u>

As set forth more fully in Blankenship's Initial Brief, qualified immunity does not apply to claims for injunctive or declaratory relief. (Initial Brief at 54-55). While Blankenship alleged a claim for damages, the crux of this case is the injunctive and declaratory relief sought. Blankenship wishes to continue to exercise his constitutionally protected right to share his religious message in a public forum in Metro Louisville.

Trooper Young challenges Blankenship's claims for injunctive and declaratory relief, as applied to him, on the merits. (Young Brief at 26-27). However, the District Court did not; the District Court found that Trooper Young was entitled to qualified immunity, and did not address the fact that qualified immunity only applies to damages. (Order, RE-101, PageID# 1336-37). This Court follows "the 'general rule,' that 'a federal appellate court does not consider an issue not passed upon below.'" *St. Paul Guardian Ins. Co. v. City of Newport*, 804 Fed. Appx. 379, 385 (6th Cir. 2020) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). Thus, this Court should not address Trooper Young's arguments against injunctive and declaratory relief on the merits.

Moreover, Trooper Young's arguments fail on their merits. First, Trooper Young argues that there was no constitutional violation. (Young Brief at 26). As set forth above, that argument fails. Next, Trooper Young argues that he "has no part in the enforcement of the city of Louisville's policies or contracts." (*Id.*). That is not true. Trooper Young enforced Metro's Policy of allowing Churchill Downs to treat the public streets and sidewalks around the racetrack as their own private property. He concedes that he was instructed that "'the area covered by the permit was actually their premises or meaning private property[.]'" (*Id.* at 13) (quoting Young Depo., RE-55-2, PageID ## 380-381). The fact that this was by instruction and was not Trooper Young's decision does not absolve him of being subject to injunctive or declaratory relief. He did not have to participate in the making of the Policy; it is enough that he enforced it. He carried out the unconstitutional removal of Blankenship from the area.

Trooper Young argues: "At no point in the litigation has [Blankenship] claimed any ongoing violation of his rights, or any possibility that Trooper Young will arrest him for preaching at the Kentucky Derby in future years – that apparently did not occur in 2023, 2024, or 2025." (Young Brief at 27). First, Blankenship has not returned to Churchill Downs since 2022 because of fear of arrest, based on what happened in 2022. (Blankenship Dec., RE-59-1, PageID# 857). Moreover, the record shows that Metro grants Churchill Downs the same permit every year. Doug

Sweeney, Metro's special events manager and Rule 30(b)(6) witness, testified that he did not recall any changes to Churchill Downs's application for a permit for the 2022 Kentucky Derby from previous years. (Metro Depo., RE-59-3, PageID# 866). Sweeney testified that, by virtue of obtaining Metro's permit, Churchill Downs controls the permitted property, and can operate as if it were their property. (*Id.* at 867). It is treated "like their private property." (*Id.* at 875). This is Metro's established Policy. Thus, absent injunctive relief in this case, it is highly likely that, if Blankenship returns to Churchill Downs to share his message, the same thing that happened in 2022 will happen again. Trooper Young effected the arrest in 2022, and must be subject to any injunction prohibiting the same thing from happening again.

The case law cited by Trooper Young states that, to be entitled to an injunction, a plaintiff must show "'a significant possibility of future harm.'" (Young Brief at 26) (quoting *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997); *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)). Notably, a plaintiff does not have to show a certainty of future harm. There certainly is a significant possibility of future harm here, where Metro's Policy is longstanding and is applied every year. As Trooper Young was involved in 2022, there is a significant possibility that he will be involved again in the future. Trooper Young is subject to Blankenship's claims for injunctive and declaratory relief.

## CONCLUSION

For the foregoing reasons and those set forth more fully in Blankenship's Initial Brief, the District Court erred by granting Metro's and Young's Motions for Summary Judgment and denying Blankenship's Motion for Summary Judgment. Accordingly, this Court should reverse the granting of Metro's and Young's summary judgment, enter summary judgment for Blankenship, and grant any further relief that is equitable and just.

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1):

• this document contains 5,604 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

• this document has been prepared in a proportionally-spaced typeface using Word 2016 in 14-point Times New Roman font.

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on August 6, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/David J. Markese
David J. Markese, Esq.
Florida Bar No. 0105041
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 430-6088
Email: david@pabilaw.org
